IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 30, 2012

Lyle W. Cayce
Clerk

No. 09-40544
Consolidated with
No. 10-40108

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOSEPH EBRON

Defendant-Appellant

Appeals from the United States District Court
for the Eastern District of Texas

Before STEWART, CLEMENT, and GRAVES, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Joseph Ebron was sentenced to death for the murder of a fellow inmate. He now appeals his conviction and sentence. In addition, he is also challenging the district court's denial of his motion for a new trial. For the following reasons, we affirm his conviction, sentence, and the denial of his motion.

I.

A.

1.

On May 6, 2005, Keith Barnes, an inmate from Washington D.C., arrived at the United States Penitentiary in Beaumont, Texas. When Barnes arrived at USP-Beaumont, he met with a case manager for an intake screening before being assigned to a cell block. During the screening, Barnes told the case manager he had testified against his codefendants in two 1998 murder trials in Washington D.C., and was concerned about his safety because other inmates from the D.C. area might have been aware of his cooperation. Notably, one of his codefendants was James Carpenter. Despite this voiced concern, Barnes was placed in the prison's general population.

The following day, Barnes was found dead on the top bunk of the bed in his cell. Barnes's autopsy revealed that had he died of multiple stab wounds. Specifically, his autopsy indicated that he was stabbed 106 times by a sharp, round instrument in an eight-inch by four-inch area over his heart, left lung, and liver.

On May 8, 2005, prison officials conducted mass interviews of inmates to gather more information regarding Barnes's murder. During these interviews, Charles Sherman, another inmate from Washington D.C., identified Ebron, Marwin Mosley, and Michael Bacote as fellow participants in Barnes's murder. At trial, the jury heard two competing narratives of what occurred on May 7th. These narratives are captured in the testimony of two witnesses: Sherman and Ebron.

2.

In 2005, Sherman was serving a sentence for armed robberies he committed in Washington D.C. and was being housed in the Delta Bravo unit of

USP-Beaumont.  According to Sherman, the following events took place upon Barnes's arrival.

In prison, inmates from particular states tend to form groups for protection.  When inmates arrive at USP-Beaumont, they are approached by fellow inmates and asked questions about "where [they are] from."  Once this information is gathered, the newly arrived inmate is pointed in the direction of other inmates who are from the same geographic area.

After Sherman learned of Barnes's arrival, he, Bacote, and Mosley approached Barnes.  When they first met Barnes, he did not tell them his real name; instead, he gave an Arabic name.  At the conclusion of this meeting, Barnes went to his cell, which was also located in Delta Bravo.

Sherman, Bacote, and Mosley then proceeded to have a conversation about Barnes.  During this conversation, Mosley told the group that he did not believe that the Arabic name Barnes provided was his actual name.  Mosley informed the group that he recognized the new inmate and thought his name was Keith Barnes.  When Sherman asked Mosley for the basis of his familiarity with Barnes, Mosley stated that he "believe[d] [Barnes] testified on some good dudes at DC jail."  Mosley specifically identified Carpenter as one of those "good dudes."

After suspecting that the new inmate was actually Keith Barnes, Mosley told Sherman and Bacote to find out the new inmate's real name.  The following morning, Bacote tricked Barnes into providing his real name.  Later that morning, Sherman and Bacote told Mosley that the new inmate was indeed Barnes.  Upon receiving confirmation of his suspicion, Mosley told the group to follow him to the recreation yard to talk to Tone, the leader of the D.C. group at USP-Beaumont.  The purpose of Mosley's visit with Tone was to inform him of his plan to kill Barnes.

Mosley, Sherman, and Bacote went out to the yard during their next opportunity. Mosley then proceeded to have a conversation with Tone in which he told Tone that Barnes had testified against his friend, Carpenter. Tone then told them to beat Barnes up and force him to request segregation from the general prison population. Mosley responded to this suggestion by stating, "No, we're going to kill him . . . I'm going to kill him." Tone replied by telling Mosley that killing Barnes was unnecessary; all they needed to do was beat him up and force him to request to be segregated. Mosley rejected this suggestion and told Tone that he was going to kill Barnes that night.

When Mosley, Sherman, and Bacote left the yard, they went back to Delta Bravo and started discussing how Barnes would be killed. While back in Delta Bravo, they decided to kill Barnes in his cell. Specifically, they appeared to agree that Bacote would go into Barnes's cell to discuss the Koran, and that Ebron and Mosley would then enter the cell to kill Barnes.

After lunch, Mosley, Sherman, and Bacote set out to look for Ebron, and located him on a walkway heading towards Delta Bravo. Mosley and Bacote then had a conversation with Ebron in which they told him about Barnes's presence at USP-Beaumont. Mosley told Ebron about the plan to kill Barnes and asked for his help. Ebron agreed to participate. Bacote subsequently jumped in the conversation and told Ebron to wrap his shirt over his head when he entered Delta Bravo in order to avoid detection by surveillance cameras. After this conversation, Mosley, Sherman, and Bacote went back to Delta Bravo to continue discussing how to kill Barnes.

Once dinner was called, Ebron entered Delta Bravo and, at some point, Bacote went into Barnes's cell. When Sherman saw Ebron in Delta Bravo around dinnertime, Ebron had his khaki shirt wrapped around his head. Ebron and Mosley subsequently entered Barnes's cell. After Ebron and Mosley entered

the cell, Bacote exited and situated himself on some stairs that were outside of Barnes's cell. Sherman subsequently joined Bacote on these stairs.

From these stairs, Sherman was able to look into Barnes's cell. When he looked in, he saw Ebron holding Barnes in a headlock, while Mosley's arms were "motioning." This observation was consistent with their plan to kill Barnes: Ebron was to hold Barnes while Mosley stabbed him.

After a couple of minutes, the door to Barnes's cell opened. Sherman then walked over and closed the door. As he closed the door, Sherman could see Mosley and Ebron lift Barnes up and place him on the top bunk of the bed in his cell. A few minutes after Sherman closed the door, Ebron and Mosley emerged from Barnes's cell and went their separate ways.

3.

In 2005, Ebron was serving his sentence for a murder that occurred in Washington, D.C. During the relevant time period, Ebron was housed in the Alpha Alpha unit of USP-Beaumont. According to Ebron, the following events occurred on the day of Barnes's murder.

During the afternoon of May 7th, Ebron was walking back to Alpha Alpha when he was approached by seven D.C. inmates, including Sherman, Bacote, and Mosley. As Mosley and Ebron walked toward Alpha Alpha, Mosley mentioned Keith Barnes and asked Ebron if Carpenter, who at one point was Ebron's cell mate at USP-Atlanta, ever said anything about Barnes testifying against Carpenter. Ebron responded by stating that he did not know the whole situation, but heard that Barnes and Carpenter were "working it out."

After hearing Ebron's response, Mosley again asked Ebron whether Barnes had testified against Carpenter. This time, Ebron provided an unequivocal affirmative answer. Upon hearing this, Mosley told Ebron that he was "going to put the knife in [Barnes]." Ebron then suggested to Mosley that stabbing Barnes was unnecessary. Instead of stabbing Barnes, Ebron indicated

5

that all they had to do was convince Barnes to request segregation. Mosley did not agree with this suggestion–he thought it "was too easy for Keith Barnes."

Despite Mosley's disagreement, Ebron continued trying to convince Mosley that stabbing Barnes was unnecessary. After Ebron rejected Mosley's suggestion that, at the very least, they beat Barnes up, Mosley told Ebron to get Barnes out of Delta Bravo that day. Ebron agreed to do so.

Not long after 5:00 p.m., Ebron left Alpha Alpha and entered Delta Bravo. Despite being prohibited from entering another unit, Ebron made his way into Delta Bravo and concealed his identity by placing his khaki shirt on his head. Once inside Delta Bravo, Ebron met up with Mosley and asked him where Barnes was located so that he could walk Barnes to the lieutenant's office. Once there, Barnes would then request administrative segregation and thus be removed from Delta Bravo. Rather than telling Ebron where Barnes was located, Mosley began mentioning pictures that he and Ebron had previously talked about. Mosley and Ebron then went into Mosley's cell to view these pictures.

After a few minutes, Ebron again asked Mosley about Barnes. In response, Mosley told Ebron that they were going to walk Barnes to the lieutenant's office. Mosley then left his cell and walked towards Barnes's cell; Ebron followed him. Before entering Barnes's cell, Ebron told Mosley to "chill out" and to let him do the talking. Because Mosley had previously revealed his preference to beat Barnes up, Ebron wanted to make clear that they were not going to physically harm Barnes.

When they entered the cell, Bacote and Barnes were having a conversation. As soon as he entered Barnes's cell, Mosley walked behind Barnes; Ebron stood by the front of the cell. Before exiting the cell, Bacote introduced Ebron as Barnes's "Sunni Muslim brother." After Ebron asked Barnes a couple of questions, Mosley jumped into the conversation and started asking Barnes

6

questions about Barnes's case and his codefendants. Ultimately, Mosley got Barnes to admit that he was indeed Keith Barnes. In response to this admission, Mosley stated, "Yeah. You a snitch."

Mosley then declared that Barnes needed to be removed from the general population. Upon hearing this, Barnes turned to Ebron and stated, "Akhee. I just talked to the Muslims. They gave me my protection–they gave me their protection."[1] As soon as Barnes made this statement, Ebron wanted to get out of the cell and talk to Barnes in private. After Ebron and Barnes agreed to leave Barnes's cell, Mosley punched Barnes on the side of his head. This blow caused Barnes to fall on the bottom bunk of the bed located in his cell.

Once Barnes was on the bed, Mosley jumped on Barnes, straddled him, and started stabbing him with a chrome knife that was tied around his fist. Barnes fought back against Mosley, but could not stop Mosley in his quest to "stab [Barnes's] heart out." According to Ebron, he did not participate in the assault. Indeed, not only did Ebron plead with Mosley to stop stabbing Barnes, but he also refused Mosley's request for help in subduing Barnes.

After he made sure that Barnes was dead, Mosley hopped off Barnes's corpse, grabbed a towel, and unsuccessfully attempted to close the cell door. Mosley then yelled outside the door and requested assistance in closing the cell door. The door was closed from the outside after Mosley made his request.

When the door closed, Mosley confronted Ebron and asked him why he did not assist in Barnes's murder. In response, Ebron stated that he "wasn't trying to be part of no murder." After feeling threatened by Mosley, Ebron agreed to help Mosley place Barnes's body on the top bunk. Mosley then washed his hands, cleaned off his knife, and wiped down areas he may have touched. Mosley and Ebron then left the cell.

---

[1] "Akhee" or "Akhi" means brother in Arabic.

B.

On August 15, 2007, a federal grand jury returned a two-count indictment against Ebron, Bacote, and Sherman.[2] Count I of the indictment charged the defendants with murder; Count II charged them with conspiracy to commit murder.

In September 2007, the government filed a Notice of Intent to Seek the Death Penalty against Ebron. Of the three defendants, only Ebron faced the possibility of a death sentence.[3] On March 19, 2008, the district court severed Ebron's trial. Before trial, the district court also decided to divide Ebron's trial into three phases: guilt/innocence, eligibility for the death penalty, and selection of a sentence.

C.

1.

a.

After seven days of individual voir dire, twelve jurors and five alternates were empaneled. The empaneled jurors started hearing evidence on April 20, 2009. On this day, the government had Sherman testify to his version of what occurred on the day of Barnes's murder. The following day, the prosecution also presented the testimony of two inmates who provided additional details of the activity that took place in Delta Bravo after Barnes arrived at USP-Beaumont. One of these inmates, Johnny Bazile, testified that, on the night of Barnes's murder, Bacote told him, in a rambling manner, that Ebron and Mosley had "punished" Barnes. Bazile also testified that Bacote told him that Bacote had held Barnes "to stop him from hollering."

---

[2] Mosley committed suicide before he could be indicted for Barnes's murder.

[3] Bacote is allegedly mentally retarded, and thus, under Atkins v. Virginia, 536 U.S. 304 (2002), cannot be executed. The charges against Sherman were dropped in exchange for his trial testimony.

That same day, the jury heard testimony from Robert Nylen, an intelligence specialist for the Federal Bureau of Prisons who, on the day of Barnes's murder, reviewed USP-Beaumont's surveillance camera footage. At trial, the government showed the surveillance camera footage to the jury while Nylen provided testimony regarding his understanding of what was taking place in the footage. In his testimony, Nylen stated that the video footage captured Ebron entering and exiting Barnes's cell. Additionally, Nylen also testified that a portion of the video capturing Bacote raising his arm before Ebron and Mosley entered Barnes's cell actually depicted Bacote giving Ebron and Mosley a "thumbs up."

On April 23, 2009, Dr. Tommy Brown testified on behalf of the government. In his testimony, he opined that the wounds found on Keith Barnes's body were consistent with a victim being restrained from behind while being stabbed from the front.

Beginning on this day and carrying over to April 24th, the government presented witnesses who testified about three separate incidents where Carpenter and Ebron engaged in collaborative acts of violence. These witnesses–Tim Zuppinger, Leander White, and Steven Perry–stated that while at USP-Atlanta, Carpenter and Ebron worked together in beating up two inmates in three separate incidents. The government used these individuals as Federal Rule of Evidence Rule 404(b) witnesses to prove similar acts that, according to the government, showed that Ebron had the motive and intent to harm Barnes because he had testified against Carpenter.

On April 28, 2009, the government placed Lamont Bailey, another D.C. inmate, on the witness stand. In his testimony, Bailey stated that in July 2005, Mosley told him that Mosley and "Akh" killed Barnes because he had served as a government witness.

9

Over the course of developing its case, the government also presented the testimony of three Bureau of Prisons officials–Carl Powers, Derric Wilson, and Eric Rayburn–who discussed various aspects of penitentiary life, prisoner behavior, and inmate-on-inmate violence.

Once the government concluded its case-in-chief, the defense presented four witnesses. Three of these witnesses warrant mention. First, Carpenter took the stand and testified about his relationship with Ebron, the USP-Atlanta fights, and his need for Keith Barnes to testify in a habeas petition he had initiated. Second, Dr. Steve Pustilnik provided expert testimony supporting Ebron's version of what occurred in Barnes's cell. Specifically, Dr. Pustilnik testified that "[Barnes] could easily have been restrained by one party by their body weight on top of him and having then delivered all of [the] wounds to him in this one focal area, in the upper abdomen and left side of his chest." Third, Ebron took the stand and recounted his version of what took place on May 7, 2005.

In its rebuttal case, the government presented Paul Wingate. At trial, Wingate stated that he served as one of the detectives on the case in which Barnes testified against Carpenter. During his investigation in that case, Wingate obtained several letters written by Carpenter. While on the witness stand, Wingate read from some of these letters. In one of these letters, Carpenter wrote, "Anger, I don't get mad. I get even. I can't say I be angry, but I do live for revenge." In another, Carpenter mentioned that Barnes had given a "bad statement." In a third letter, Carpenter wrote the following to Barnes: "[I]f you lose the case, you're going to have enemies you didn't even know or you didn't even do nothing to." Despite objections, the district court admitted these letters to prove Ebron's motive in killing Barnes and to show inconsistencies in Carpenter's testimony.

b.

The jury started deliberating at approximately 4:00 p.m. on Thursday, April 30, 2009. The following day, at around 3:30 p.m., the jury submitted a note to the district court stating the following: "The jury is hopelessly deadlocked. It cannot reach a unanimous verdict." In response, the district court instructed the jury to continue their deliberations. At the end of this day, the district court informed the jury that there would be a three-day break in deliberations.

The jury reconvened on Thursday, May 7th. On this day, the jury sent another note to the district court which stated, "There is no way we can arrive at a unanimous decision. I don't believe any amount of further deliberation will achieve any movement. There's been no change since Friday morning. I can discuss this with you privately if you wish." After receiving this note, the district court read the jury the modified Allen charge contained in the Fifth Circuit pattern jury instructions.

A little over an hour after the reading of the modified Allen charge, the jury sent a note to the district court requesting an easel and a flip chart. Later that same day, it requested a transcript of Ebron's trial testimony. Because a transcript was unavailable, Ebron's testimony was read back to the jury in its entirety.

The following day, on Friday, May 8, 2009, the district court received a note from a juror, Brittany Johnson, who did not reenter the jury room after lunch. Johnson's note specifically stated that other jurors had cursed at her and that the situation in the jury room was extremely stressful for her. In addition, Johnson's note mentioned that the jury was hung and that it had deliberated thoroughly. After reading this note, the district court asked Johnson to "return to the jury room and follow [its] instructions." At this point, Ebron unsuccessfully moved for a mistrial based on this communication and the two previous notes that were sent from the jury.

Later that day, the district court received another note from a juror. In this note, a juror requested part of the following Tuesday off to attend an awards breakfast. The district court denied this request. Notably, however, this note prompted a discussion between the attorneys and the district court regarding the jury's deliberations. At the end of this discussion, the attorneys agreed that the district court should question the foreperson to ascertain whether the jury was still deliberating. The district court agreed to do so.

Once the foreperson arrived in the courtroom, the district court began questioning him. When asked whether any juror was refusing to follow the district court's instructions, the foreperson answered in the affirmative. In addition, when asked about the perceived basis for the refusal to follow instructions, the foreperson stated that it was something other than a different view as to the weight of the evidence. In subsequent responses, the foreperson identified Brittany Johnson as the juror in question, and also indicated that Johnson had made a comment about defense counsel, Katherine Scardino. Based on this information, the district court decided to question the remaining jurors to investigate the allegation made by the foreperson. Before the remaining jurors were questioned, Ebron unsuccessfully moved for a mistrial.

After questioning the remaining jurors, the district court dismissed Johnson for "bringing personal feelings to bear, based on personal experiences, into the trial and for making comments about one of the lawyers in the case[.]" Once Johnson was dismissed, she was replaced with an alternate.

That weekend, Ebron filed a written motion for a mistrial based on Johnson's removal. In a memorandum and order dated May 18, 2009, the district court denied Ebron's motion.

The reconstituted jury began its deliberations on Monday, May 11, 2009. It deliberated for approximately five hours before returning a guilty verdict on both counts.

2.

The eligibility phase of the trial started immediately after the guilty verdict was read. The government submitted the following three statutory aggravating factors to support Ebron's eligibility for the death penalty: (1) having a "[p]revious conviction of offense for which a sentence of death or life imprisonment was authorized"; (2) the "heinous, cruel, or depraved manner of committing [his] offense"; and (3) "substantial planning and premeditation." On May 13, 2009, the jury concluded that the government had sufficiently proven these three aggravating factors.

That same day, the district court began the selection phase of Ebron's trial. In support of its position that death was the appropriate sentence for Ebron, the government submitted two nonstatutory aggravating factors to the jury: (1) that "Ebron's motive for the murder of Keith Barnes was Barnes' past cooperation and testimony in the prosecution of Barnes' co-defendants"; and (2) that "Ebron pose[d] a continuing danger to the lives and safety of others while incarcerated because it is likely that he will commit criminal acts of violence in the future." To substantiate these factors, the government presented a number of witnesses. Two warrant brief mention at this point. First, the government had Detective Lorren Leadmon testify regarding Ebron's first murder conviction. Second, the government presented the testimony of Peter Zeidenberg, the attorney who prosecuted Barnes for the crime that placed him in prison. While on the witness stand, Zeidenberg stated that Barnes cooperated with officials by testifying against his codefendants, including Carpenter.

On May 14, 2009, five family members testified on Ebron's behalf. Three of his aunts testified that Ebron was a normal, happy kid until he started running into trouble. Ebron's younger brother also served as a witness and testified that Ebron had a positive impact on his life. Ebron's stepmother also took the witness stand and stated that Ebron's environment had a negative

impact on him. Along with these family members, Ebron also presented psychological testimony and testimony from Jim Aiken, an expert whose opinion supported Ebron's position that he would not pose a future danger in prison.

In its rebuttal, the government had two individuals, including a witness named Greg Hershberger, testify in an attempt to counter Ebron's contention that he would not pose a future danger in prison.

On May 18, 2009, the jury concluded that the death penalty was the appropriate sentence for Ebron's conviction on Count I of the indictment. The following month, the district court held a sentencing hearing on Count II. Based on a total offense level of 43 and a criminal history level of 3, the district court sentenced Ebron to a life sentence.

D.

In October 2009, Ebron filed a motion for a new trial in which he presented three grounds for relief. First, Ebron argued that, based on the information it had before it at trial, the district court's decision to dismiss Johnson rather than declare a mistrial "violated his Sixth Amendment right to a unanimous verdict and his Fifth Amendment right to due process." Second, he contended that a post-trial affidavit submitted by Johnson made "clear that Johnson believed, and told other jurors, that the Government had not proved Ebron's guilt." According to Ebron, this affidavit supported his position that Johnson was improperly removed from the jury. Third, Ebron argued that newly discovered statements made by Bacote were relevant and material to the central issues at trial and, given their content, would likely produce an acquittal on retrial. On January 28, 2010, the district court issued a written decision in which it rejected Ebron's arguments and denied his motion for a new trial.

This is an appeal from his convictions and death sentence. A related appeal regarding the denial of his motion for a new trial has been consolidated with this case.

14

II.

On appeal, Ebron has raised a number of issues challenging his convictions and death sentence. These issues can be organized in five general categories: (1) errors surrounding Johnson's dismissal; (2) evidentiary errors at the guilt/innocence phase; (3) prosecutorial misconduct throughout the trial; (4) sentencing errors; and (5) post-trial error. We will address each category separately.

A.

The first category of issues raised by Ebron involves alleged errors surrounding Johnson's dismissal. In his brief, Ebron contends that the district court committed the following four errors in its handling of the Johnson episode: (1) individually interviewing jurors after it questioned the foreperson; (2) dismissing Johnson from the jury; (3) denying his motions for a mistrial; and (4) failing to rehabilitate the reconstituted jury after Johnson's dismissal. When taken together, Ebron maintains that these supposed errors warrant the reversal of his convictions. We address each contention in turn.

1.

Ebron contends that the district court erred in interviewing jurors because the information it used in deciding to conduct these interviews–namely, the foreperson's statements in his interview–showed that the jury disagreed about the merits of the case and witness credibility. Ebron asserts that because the district court did not have unambiguous evidence that Johnson was refusing to apply the law as instructed, it should have refrained from interviewing jurors.

We review a district court's response to juror misconduct for abuse of discretion. See United States v. Edwards, 303 F.3d 606, 634 (5th Cir. 2002). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (internal citations omitted).

There are two competing interests that are implicated in a judge's decision to investigate allegations of juror misconduct during deliberations. On one hand, it is recognized that the secrecy of deliberations is essential to the success of the jury system. "It is well understood, for example, that disclosure of the substance of deliberations may undermine public confidence in the jury system." United States v. Thomas, 116 F.3d 606, 618 (2d Cir. 1997) (citation omitted). Preserving the secrecy of jury deliberations "requires not only a vigilant watch against external threats to juror secrecy, but also strict limitations on intrusions from those who participate in the trial process itself, including counsel and the presiding judge." Id. at 620. Thus, "[a] court must limit its own inquiries of jurors once deliberations have begun." Id.

On the other hand, juror compliance with instructions, along with fidelity to their oath, is important in preserving the sanctity of jury verdicts. While the institutional interest in the secrecy of juror deliberations is important, district courts also have a duty, and the concomitant authority, to ensure that jurors are obeying instructions and adhering to their oath.

Balancing these two interests is a challenge a district court must undertake when faced with allegations of juror misconduct during deliberations. "[A] district court should be more cautious in investigating juror misconduct during deliberations than during trial, and should be exceedingly careful to avoid any disclosure of the content of deliberations." United States v. Boone, 458 F.3d 321, 329 (3d Cir. 2006). While exercising due caution, a district court may conduct an investigation in situations where it is presented with substantial evidence of jury misconduct. See id. (holding that "where substantial evidence of jury misconduct—including credible allegations of jury nullification or of a refusal to deliberate—arises during deliberations, a district court may, within its sound discretion, investigate the allegations") (citations omitted). Such an investigation may be conducted via careful juror questioning or any other

16

appropriate means. Id. (citations omitted). In adopting this standard, "we emphasize that a district court, based on its unique perspective at the scene, is in a far superior position than [we are] to appropriately consider allegations of juror misconduct, both during trial and during deliberations." Id.

Here, the district court did not abuse its discretion in interviewing jurors in order to investigate allegations of juror misconduct. In his interview, the foreperson clearly indicated his belief that there was a juror who was refusing to follow the court's instructions.[4] Based on its response to his statement, it appears as if the district court found the foreperson credible. This credibility determination is entitled to deference. See Boone, 458 F.3d at 329. Given the clear and credible nature of the foreperson's allegations, the district court had a sufficient basis for initiating an investigation to uncover whether a juror was in fact refusing to follow instructions. See id. at 329-30 (holding that credible allegations of misconduct can provide a basis for investigating allegations). Accordingly, the district court's decision to conduct an investigation into juror misconduct was not an abuse of its discretion.[5]

2.

In addition, Ebron argues that the district court erred in dismissing Johnson. In his brief, he concedes that even after deliberations have begun, a juror may be dismissed for good cause. But he contends that when the nature of any alleged misconduct prompts a district court to inquire into the juror's

---

[4] This situation should be contrasted with those instances where jury deliberations have potentially been tainted by outside influences. See, e.g., United States v. Webster, 750 F.2d 307, 338 (5th Cir. 1984) ("[W]e have distinguished between jury panels tainted by outside influence, such as publicity or direct appeals from third parties, and panels on which one or more of the jurors themselves have violated an instruction of the court."). In those instances, a different legal framework would govern our analysis. See id.

[5] While not entirely clear, Ebron appears to object only to the district court's decision to conduct an investigation. He does not challenge the specific form or scope of the district court's investigation.

"thought processes," dismissing a juror is improper unless, after inquiry, there is "no possibility" that the juror's problem stems from her view of the sufficiency of the evidence. Ebron concludes that, since this possibility did exist in his case, the district court's dismissal of Johnson was improper.

"District courts have discretion to dismiss jurors for just cause." Edwards, 303 F.3d at 631. "A district court abuses its discretion only when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Id. (internal quotation marks and citation omitted). Moreover, "[u]nless the court's removal of the juror has prejudiced the defendant, we will not disturb the court's decision." United States v. Virgen-Moreno, 265 F.3d 276, 288 (5th Cir. 2001) (citing United States v. Leahy, 82 F.3d 624, 628 (5th Cir. 1996)). And prejudice will be found only "if the juror was discharged without factual support or for a legally irrelevant reason." Id. (citation and quotation marks omitted).

"'[U]nder the clearly erroneous standard, we may not reverse the district court's findings of fact unless the review of the relevant evidence leaves us with the definite and firm conviction that a mistake has been committed.'" Edwards, 303 F.3d at 631 (quoting Broussard v. United States, 989 F.2d 171, 178 (5th Cir. 1993)). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir. 2001) (citation omitted).

Even after deliberations have begun, a juror may be dismissed for "good cause." Fed. R. Crim. P. 23(b)(2)(B); Edwards, 303 F.3d at 631. A juror's inability to follow instructions is a legally valid basis for dismissal. Edwards, 303 F.3d at 631 (citing United States v. Vega, 72 F.3d 507, 512 (7th Cir. 1995)). Similarly, a lack of candor can also serve as the basis for dismissing a juror. Id. (citing United States v. Fryar, 867 F.2d 850, 853 (5th Cir. 1989)).

In his brief, Ebron seeks to shift the applicable legal framework from the "good cause" standard to the "no possibility" rule that has been recognized in various circuits. To support his position, he relies heavily upon the Second Circuit's decision in Thomas, the D.C. Circuit's decision in United States v. Brown, 823 F.2d 591 (D.C. Cir. 1987), and the Ninth Circuit's decision in United States v. Symington, 195 F.3d 1080 (9th Cir. 1999). According to Ebron, these decisions support the proposition that "when the nature of the alleged misconduct prompts a district court to inquire 'into the juror's thought processes' . . . dismissing a juror is improper, unless, after inquiry, 'there is no possibility that the juror's problem stems from [her] view of the sufficiency of the evidence."

This reading of Brown, Thomas, and Symington, however, is inconsistent with our interpretation of these cases. In Edwards, we read this trio of cases as standing "for the limited proposition that a court may not dismiss a juror based upon its conclusion that the juror is failing to participate in the deliberative process in accordance with the law unless there is no possibility that the juror's problem stems from his view of the sufficiency of the evidence." 303 F.3d at 633. In affirming the district court's dismissal of a juror for lack of candor and an inability to follow instructions, this court interpreted the reasoning in Brown, Thomas, and Symington as extending "only to those dismissals where the juror's conduct cannot be evaluated without delving into the reasons underlying the jurors' views of the case, i.e., where the deliberative process has been implicated." Id.

Under Edwards's reading of Brown, Thomas, and Symington, the "no possibility" rule is triggered only when the district court dismisses a juror based on its "conclusion that the juror is failing to participate in the deliberative process in accordance with the law." Id. Here, the district court's dismissal of Johnson was not based solely on Johnson's failure to properly participate in the deliberative process. Rather, it removed Johnson from the jury for three

reasons: (1) bias based on "personal feelings"; (2) her failure to abide by the juror's oath in introducing "extrinsic evidence" during jury deliberations; and (3) lack of candor under oath. Given that the latter two reasons are independent and do not implicate the deliberative process, the "no possibility" rule applied in Brown, Thomas, and Symington is inapplicable in this case.

Had the district court dismissed Johnson based on bias alone, we would have been faced with deciding whether to formally incorporate some variation of the "no possibility" rule into our jurisprudence. But here, where the district court provided two independent reasons for dismissal that (1) do not involve a "fail[ure] to participate in the deliberative process in accordance with the law"; and (2) are plausible in light of the record as a whole and are thus not clearly erroneous, such a jurisprudential step is unnecessary. Instead, our resolution of this issue can be based solely on an application of Rule 23's good cause standard. Under this standard, the district court did not abuse its discretion in dismissing Johnson. The two aforementioned reasons–lack of candor and a failure to abide by instructions–are legally valid grounds for dismissing a juror. Edwards, 303 F.3d at 631.

Our decision in Edwards supports this conclusion. In that case, we affirmed the dismissal of a juror based on a lack of candor and a failure to abide by instructions. Id. After setting forth our understanding of the "no possibility" rule, we concluded that because dismissals on the aforementioned grounds do not implicate the deliberative process, they do not trigger the rule set forth in Brown, Thomas, and Symington. Here, the district court dismissed Johnson on similar grounds. In light of the similarities between the basis for dismissal in Edwards and the grounds provided by the district court in this case, we conclude that Johnson's dismissal was consistent with this circuit's case law. The district court therefore did not abuse its discretion in dismissing Johnson.

3.

Ebron asserts that after its interview with the foreperson, the district court was aware that the jury was deadlocked. Based on this interview and the notes submitted by the jury, Ebron maintains that the jury was clearly deadlocked. He contends that because a deadlocked jury presents the classic basis for a mistrial, the district court should have granted his motion for a mistrial. Relatedly, he argues that the district court should have granted the motion for a mistrial he made after the district court interviewed the remaining jurors.[6] According to Ebron, a mistrial should have been granted not only because of the problems the jury was facing, but also because of the alleged taint that Johnson's removal left on a reconstituted jury.

The decision whether to grant a mistrial is reserved to the broad discretion of the trial judge. Renico v. Lett, 130 S. Ct. 1855, 1863 (2010). A district court's decision to deny a mistrial is reviewed for abuse of discretion. United States v. Mitchell, 166 F.3d 748, 751 (5th Cir. 1999).

"[T]rial judges may declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so." Renico, 130 S. Ct. at 1863 (quoting United States v. Perez, 9 Wheat. 579, 580 (1824)). "The decision to declare a mistrial is left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious cases.'" Id. Since Perez, the Supreme Court has clarified that the "manifest necessity" standard cannot be interpreted literally, and that a mistrial is appropriate when there is a high degree of necessity. Id.

---

[6] Ebron orally moved for a mistrial at various points in the proceedings. He also presented a written motion for a mistrial based on Johnson's removal a couple days after she was dismissed. On appeal, he does not appear to address the denial of his written motion for a mistrial.

In this case, the district court did not abuse its discretion in denying the aforementioned motions for a mistrial. First, with respect to the denial after the foreperson's interview, we do not conclude that the district court abused its discretion in deciding that a mistrial was not a manifest necessity. Given the information the foreperson provided regarding one juror's alleged failure to follow instructions, it was reasonable for the district court to investigate this allegation. Granted, in light of the information it had received regarding the jury being deadlocked, the district court could have potentially declared a mistrial. See Renico, 130 S. Ct. at 1863 (noting that a mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict has long been considered the classic basis for a proper mistrial). But given the allegations regarding juror misconduct, it also had the discretion to conduct an investigation into those allegations. The district court's decision to choose the latter course of action is not an abuse of its broad discretion. Contrary to what Ebron suggests, the fact that the district court had information suggesting that the jury was deadlocked does not mandate a mistrial. Such an argument relies upon an incorrect and rigid understanding of what is required to support a mistrial. See id. ("We have expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial.").

Second, with respect to the motion presented after juror interviews, we do not conclude that the district court abused its discretion in not declaring a mistrial. When presented with this motion, the district court had the option of making one of two discretionary decisions: (1) it could have declared a mistrial based on the problems the jury was having and the introduction of extrinsic information into deliberations; or (2) it could have dismissed Johnson and replaced her with an alternate. Given the availability of the latter option, the district court was not faced with "urgent circumstances" which would have made

a mistrial a manifest necessity. In its judgment, the district court believed that the second option was acceptable. Based on the totality of the record, the approach taken by the district court was not an abuse of its broad discretion.

In sum, we determine that the district court did not abuse its discretion in refusing to grant Ebron's motions for a mistrial.

4.

Along with his first three challenges in this category, Ebron also contends that the instructions provided by the district court after Johnson's dismissal were inadequate. According to him, more instructions were required. Specifically, he notes that the district court failed to do the following: (1) "advise the jury to disregard the so-called 'extrinsic' evidence that was the purported reason for Johnson's dismissal"; (2) "tell the jurors to disregard whatever had gone on during their prior deliberations"; and (3) inform "jurors that they were not to infer that the [district court] held any views regarding the proper verdict to be rendered." The district court erred, Ebron concludes, in not providing these instructions. In addition, he argues that the district court erred by failing to interview jurors individually after Johnson's removal "to attempt to ensure that the jury was rehabilitated." Ebron did not object to any of these alleged deficiencies at trial.

"Where a party fails to offer a timely objection to jury instructions, claims of error are reviewed for plain error." United States v. Diaz, 637 F.3d 592, 601 (5th Cir. 2011). Under the plain error standard of review, "[a]n appellate court may not correct an error the defendant failed to raise in the district court unless there is '(1) error, (2) that is plain, and (3) that affects substantial rights.'" United States v. Mares, 402 F.3d 511, 520 (5th Cir. 2005) (quoting United States v. Cotton, 535 U.S. 625, 631 (2002)). "'If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial

proceedings.'" Id. (quoting Cotton, 535 U.S. at 631). This standard of review "requires considerable deference to the district court." United States v. Peltier, 505 F.3d 389, 391 (5th Cir. 2007).

Under the Federal Rules of Criminal Procedure, once an "alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Fed. R. Crim. P. 24(c)(3). The record reflects that the district court did exactly what Rule 24(c)(3) requires when it replaced Johnson with an alternate.

On the morning of May 11, 2009, the reconstituted jury began its deliberations. Before the jury started deliberating, the district court provided the following instruction:

> As you notice, a new juror has been substituted. You're not to discuss or speculate as to the cause for the change in the jury complement. You must, however, begin your deliberations anew, as the new juror has not had the benefit of your previous discussions and examination of the evidence and you have not had the benefit of his views.

In his brief, Ebron does not point to any binding legal precedent that supports his assertion that the district court erred in failing to provide a more extensive set of instructions. His argument regarding rehabilitative interviews of jurors is similarly unsupported. Because the district court did exactly what Rule 24(c)(3) requires, it did not err. Accordingly, Ebron's arguments regarding the adequacy of the district court's treatment of the reconstituted jury fail to provide a basis for unsettling his convictions.

5.

Ebron argues that, when viewed cumulatively, the "errors involving the jurors' deadlock—the district court's refusal to grant a mistrial, the removal of a holdout juror, and the inadequate rehabilitation of the new jury—combined to

produce a coerced verdict." In making this argument, he appears to invoke the cumulative error doctrine. We are unpersuaded by his position.

"A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). Under the cumulative error doctrine, "an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Munoz, 150 F.3d 401, 418 (5th Cir. 1998) (citations omitted). In applying this doctrine, a court must determine whether the errors "so fatally infect the trial that they violated the trial's fundamental fairness." United States v. Fields, 483 F.3d 313, 362 (5th Cir. 2007) (quoting United States v. Bell, 367 F.3d 452, 471 (5th Cir. 2004)).

In this case, the cumulative error doctrine does not apply for one simple reason: there is nothing to cumulate. The district court did not abuse its discretion in choosing to investigate and remove Johnson rather than declare a mistrial. Nor did the district court plainly err in not providing a more extensive set of instructions to the reconstituted jury or failing to conduct rehabilitative juror interviews. Accordingly, the cumulative error doctrine cannot be used to undermine Ebron's convictions.

B.

The second category of issues raised by Ebron addresses various alleged evidentiary errors that he claims tainted the guilt/innocence phase of his trial. According to Ebron, the district court abused its discretion in admitting various forms of extrinsic evidence, hearsay, and expert testimony. In addition, he claims that the district court plainly erred in admitting other forms of hearsay and expert/lay testimony. We address each contention in turn.

1.

At trial, the government presented testimony regarding three fights Ebron participated in while housed at USP-Atlanta. First, the government presented

the testimony of Tim Zuppinger, a food administrator at USP-Atlanta. In his testimony, Zuppinger stated that in May 2003, Ebron and Carpenter assaulted another inmate, Joseph Brown, in the cafeteria. According to Zuppinger, when the fight was broken up, Carpenter yelled, "That's how we handle snitches, bitch!"

Second, the government had Leander White, a corrections officer at USP-Atlanta, testify. According to White, Ebron and Carpenter attacked Brown a second time when the three men were placed in a holding tank. After Carpenter was subdued, White asked Carpenter why he attacked Brown. In response, Carpenter stated, "Man, that dude ain't nothing but a snitch." After Carpenter made this statement, Ebron allegedly stated, "We already know that dude is a snitch."

Third, the district court admitted the testimony of Steven Perry, another USP-Atlanta worker, who stated that on the morning of November 10, 2003, Ebron and Carpenter attacked an inmate whose surname is also Perry. Ebron objected to the admission of these witnesses' testimony at trial.

On appeal, Ebron recognizes that Federal Rule of Evidence 404(b) allows for the introduction of prior bad acts for the purpose of proving motive or intent, but argues that the testimony regarding these three incidents was irrelevant for both purposes. Alternatively, he contends that even if this "evidence was marginally probative of intent or motive, reversal is required because any probative value it may have had was far outweighed by its unfair prejudice."

A district court's admission of extrinsic evidence over a Rule 404(b) objection is reviewed under a heightened abuse of discretion standard. United States v. Alarcon, 261 F.3d 416, 424 (5th Cir. 2001). Under this standard of review, erroneous admissions under Rule 404(b) are subject to a harmless error inquiry. United States v. McCall, 553 F.3d 821, 827 (5th Cir. 2008) (citation

omitted). The government has the burden of establishing harmlessness beyond a reasonable doubt. Id. (citation omitted).

Rule 404(b) provides that "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). In criminal cases, however, this "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. at (b)(2). It is unnecessary that the extrinsic evidence fit neatly under one of the exceptions listed in Rule 404(b), as this list is not exhaustive. See Wright & Graham, Federal Practice and Procedure: Evidence § 5248 (explaining that "[t]he list of 'exceptions' in Rule 404(b) is really no more than a set of examples of instances in which the use of the evidence does not offend the general rule of exclusion"). "[T]he general rule of exclusion in Rule 404(b) only excludes evidence of other crimes when offered to prove the conduct of a person by resort to an inference as to his character." Id.

In United States v. Beechum, we interpreted Rule 404(b) and announced the following two-step test for determining the admissibility of extrinsic evidence:

> First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice[.]

582 F.2d 898, 911 (5th Cir. 1978).

Here, the first portion of the Beechum analysis has been satisfied. The three USP-Atlanta incidents involving Carpenter and Ebron are relevant for purposes of establishing motive. Specifically, this evidence demonstrates a relationship between Carpenter and Ebron, which, in turn, is relevant to the issue of whether Ebron had a motive to kill Barnes, the individual who helped

27

put Carpenter behind bars. Because these prior incidents are relevant to an issue other than Ebron's character, the challenged testimony satisfies the first portion of the Beechum analysis.

The second portion of the Beechum analysis has also been satisfied. Under this portion of the analysis, we must consider whether the extrinsic evidence possesses a probative value that is not substantially outweighed by its undue prejudice. In terms of probative value, we conclude that the challenged evidence is probative in establishing a motive for Ebron's actions. This probative value, we also conclude, is not substantially outweighed by any undue prejudice. In its instructions, the district court noted that this testimony could be used for "limited purposes," namely, "to determine whether [Ebron] had the state of mind, motive, or intent necessary to commit the crime charged in the indictment." A similar instruction was provided at the end of the guilt/innocence phase of the trial. In the past, this court has indicated that the prejudicial effect of Rule 404(b) testimony may be minimized by a proper jury instruction. See United States v. Taylor, 210 F.3d 311, 318 (5th Cir. 2000); McCall, 553 F.3d at 829 ("Any prejudice was certainly mitigated, even if not eliminated, by the district court's limiting instruction given contemporaneously with the admission of the evidence, which limiting instruction the district court repeated during the jury charge."). Because we must presume that the jury followed the district court's instructions, see Zafiro v. United States, 506 U.S. 534, 540 (1993), we determine that any possible prejudice Ebron suffered as a result of the inclusion of the challenged testimony was mitigated to the point where it did not substantially outweigh its probative value. Accordingly, we conclude that the second portion of the Beechum analysis has been satisfied. The district court therefore did not abuse its discretion in admitting the testimony provided by the government's Rule 404(b) witnesses.

2.

Ebron also argues that the district court erred in admitting certain portions of Lamont Bailey's testimony. In his testimony, Bailey stated that Mosley told him that Mosley and "Akh went in [Barnes's cell] and put in the work," and that Mosley "stabbed [Barnes] so many times that they had to take breaks."[7] At trial, the district court admitted this testimony, over Ebron's objection, as a statement against penal interest. On appeal, Ebron argues that "[w]hile the statement implicating Mosley himself in the stabbing may have qualified as a statement against penal interest, the statement about 'Akh,' who the Government argued was Ebron, did not and should have been excluded."

"Review of a trial court's evidentiary rulings is for abuse of discretion, subject to harmless error review." United States v. Jackson, 636 F.3d 687, 692 (5th Cir. 2011) (citation omitted). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." Yanez Sosa, 513 F.3d at 200.

Federal Rule of Evidence 804(b)(3) creates a limited exception to the hearsay rule for statements against the declarant's penal interest. To be admissible under Rule 804(b)(3), such a declaration must meet the following three-part test:

> (1) The declarant must be unavailable; (2) The statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) The statement must be corroborated by circumstances clearly indicating its trustworthiness.

United States v. Dean, 59 F.3d 1479, 1492 (5th Cir. 1995) (quotation marks and citation omitted). "We will uphold a district court's determination as to the trustworthiness of an out-of-court statement unless it is clearly erroneous." Id. (citation omitted).

---

[7] According to Bailey, "putting in work" means "committing the crime."

In this case, the parties do not dispute that Mosley's statement implicating himself in the murder is a statement against penal interest. What they do dispute is the admissibility of the statement's reference to "Akh."

According to Ebron, the Supreme Court's decision in Williamson v. United States, 512 U.S. 594 (1994), stands for the proposition that the "against-penal-interest exception to the hearsay rule does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." From this proposition, Ebron argues that the non-self-inculpatory reference to Akh in Mosley' statement to Bailey is not admissible under Rule 804(b)(3).

Ebron overreads Williamson. In Williamson, the Supreme Court issued a fractured opinion in which it indeed held that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." 512 U.S. at 600-01. Notably, however, the statement at issue in Williamson was made to authorities after the declarant was arrested. See id. at 596. In contrast, Mosley's statement was made to a fellow inmate. This distinction, we conclude, is consequential. Unlike the situation where a declarant implicates himself and the defendant in a statement made to officials, a statement made outside a custodial context does not provide the same set of

incentives that create the risk of an unreliable statement.[8] Given this important distinction, we are convinced that Williamson, despite some of its broad language, does not govern the admissibility of Bailey's testimony.[9]    In the wake of the Supreme Court's divided opinions in Williamson and Lilly v. Virginia, 527 U.S. 116 (1999), this area of law appears to be fraught with uncertainty.  See Mueller at § 8.75 ("In the uncertainty left by the divided opinions in Williamson and Lilly, courts sometimes find that [Rule 804(b)(3)] does reach third-party statements mentioning the defendant.").    This uncertainty is heightened in this case because, unlike the statements at issue in Williamson and Lilly, Mosley's statement was not made during custodial questioning.    Given this uncertainty, the district court did not abuse its discretion in admitting the challenged portions of Bailey's testimony.  See Yanez Sosa, 513 F.3d at 200 (holding that a trial court abuses its discretion when its ruling is based on an erroneous view of the law).

---

[8]    The Advisory Committee Notes to Rule 804(b)(3) mention the significance of this distinction. The relevant portion of the Notes specifically state: "[Douglas v. Alabama, 380 U.S. 415 (1965) and Bruton v. United States, 389 U.S. 818 (1968)] however, by no means require that all statements implicating another person be excluded from the category of declarations against interest. Whether a statement is in fact against interest must be determined from the circumstances of each case.  Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest. . . . On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying." Fed. R. Evid. 804 advisory committee's note to Exception (3).  Scholars have also recognized that an important aspect of Williamson is the fact that the statement at issue was made during police questioning.  See Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8.75 (3d ed. 2003) ("Even more important, Williamson . . . involved police questioning of an alleged co-offender, where the risks of distortion are magnified by the 'curry favor' problem.") (hereinafter "Mueller").

[9]    While Williamson contains some broad language, its analysis is predicated on the assumption that the challenged statement was a post-arrest confession.  See Williamson, 512 U.S. at 601 (observing that the "arrest statements of a codefendant have traditionally been viewed with special suspicion").

3.

Along with the two aforementioned evidentiary challenges, Ebron also contends that the district court, over his objection, improperly admitted James Carpenter's letters. As stated earlier, these letters contained various statements revealing Carpenter's negative feelings towards Barnes and a taste for revenge. We review the admission of this evidence for abuse of discretion, subject to harmless error review. See Jackson, 636 F.3d at 692.

Rule 804(b)(3) of the Federal Rules of Evidence creates a limited exception to the hearsay rule. As stated above, to be admissible under Rule 804(b)(3), a declaration must meet the following three-part test: (1) the declarant must be unavailable; (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement must be corroborated by circumstances clearly indicating its trustworthiness. Dean, 59 F.3d at 1492 (citation omitted). The parties do not dispute the first and third parts of the test set forth in Dean. What they do dispute is whether Carpenter's letters tended to subject him to criminal liability.

This circuit has not read Rule 804(b)(3) to be limited to direct confessions of guilt. United States v. Thomas, 571 F.2d 285, 288 (5th Cir. 1978). "Rather, by referring to statements that 'tend' to subject the declarant to criminal liability, the Rule encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." Id. As part of this analysis, we must consider whether the statements made in Carpenter's letters "would not have been made by a reasonable man in his position . . . unless he believed [them] to be true." Id. at 289 (internal quotation marks omitted).

The letters at issue were collected by D.C. detectives prior to Carpenter's 1998 murder trial. In these letters, Carpenter makes statements that could be interpreted as implicating himself in criminal activity and indicating that he

was upset that others were providing information to authorities. While the exact date these letters were written is unclear, it is clear that they were drafted before Carpenter's murder trial. It is also evident that a reasonable person awaiting trial would not make these types of statements unless they were true. Though by no means conclusive of guilt or wrongdoing, these letters could have been harmful to Carpenter if presented at his trial. As such, although they are not direct confessions of guilt, they can be considered statements against penal interest. The district court therefore did not abuse its discretion in admitting Carpenter's letters.

4.

In his fourth general evidentiary challenge, Ebron asserts that Johnny Bazile's testimony regarding Bacote's statement that Ebron and Mosley had "punished" Barnes also should not have been admitted at trial. According to Ebron, this statement did not qualify as a co-conspirator statement because it was not made in furtherance of a conspiracy to commit Barnes's murder. Rather, Ebron contends that the statement simply recounted Bacote's version of the murder.

Because Ebron did not object to the challenged statement at trial, our review is for plain error. United States v. Wake, 948 F.2d 1422, 1435 (5th Cir. 1991). "Under the plain error standard, we may reverse only if (1) there was error (2) that was clear and obvious and (3) that affected [the defendant's] substantial rights." United States v. Fuchs, 467 F.3d 889, 901 (5th Cir. 2006) (internal quotation marks and citations omitted).

Federal Rule of Evidence 801 provides that certain statements which would otherwise constitute excludable hearsay under the general rule of Rule 801(c) are not hearsay by definition. United States v. Cornett, 195 F.3d 776, 782 (5th Cir. 1999). One example of definitional non-hearsay is found in Rule 801(d)(2)(e), which provides that a statement is not hearsay if the statement is

offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. Id. "Under Rule 801(d)(2)(e), the proponent of admittance must prove by a preponderance of the evidence (1) the existence of the conspiracy (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy." Id.

The parties dispute whether the challenged statement was made in furtherance of the conspiracy to kill Barnes. To be in furtherance of the conspiracy, the statement must advance the ultimate objects of the conspiracy. Id. In cases in which "a statement was found to be 'in furtherance,' either the statement itself or the conversation as a whole was intended to advance, facilitate or promote the ultimate conspiratorial objective." Id. at 783. "By way of contrast, conversations that represent 'mere idle chatter' or which are mere narratives of past conduct are not in furtherance of the conspiracy because the statement and the conversation were not intended to further the conspiracy, regardless of whether an individual co-conspirator was implicated in the conversation." Id. at 783-84.

In this case, we are unconvinced that Bacote's statement to Bazile indicating that Ebron and Mosley had "punished" Barnes can be considered "in furtherance" of the conspiracy to kill Barnes. According to the government, this statement advanced the ultimate objective of the conspiracy by "concealing it and thwarting the investigation." It contends that Bacote's sharing of this information furthered the conspiracy by chilling Bazile's honesty in the mass interviews that were conducted after the murder. This argument in unpersuasive. Read in context, Bacote's statement is merely a narrative of past conduct. As such, it cannot be interpreted as "in furtherance" of the conspiracy to kill Barnes. It therefore could not have been admitted under Rule 801(d)(2)(e).

While inadmissible under Rule 801(d)(2)(e), the district court did not plainly err in admitting Bacote's statement. As he also implicated himself in the murder, Bacote's statement is arguably admissible under Rule 804(b)(3) as a statement against his penal interest. In addition, the temporal proximity between the murder and Bacote's statement, combined with the rambling nature in which it was delivered, makes this statement potentially admissible as an "excited utterance" under Rule 803(2). Given these possible alternative grounds for admitting this statement, the district court did not obviously err in admitting Bazile's testimony regarding what Bacote told him the night of the murder. Thus, under the applicable standard of review, the admission of the challenged statement does not provide a basis for reversing Ebron's convictions.

5.

In his penultimate set of evidentiary arguments, Ebron challenges the admission of certain opinion testimony that was presented at trial. In his brief, he sets forth two general contentions under this rubric. First, he argues that Nylen's testimony regarding USP-Beaumont's surveillance camera footage was impermissible bolstering opinion. He specifically objects to Nylen's testimony which suggested that the footage depicted Bacote giving a "thumbs up" before Ebron and Mosley entered Barnes's cell. Second, he contends that the testimony provided by Powers, Wilson, and Rayburn regarding inmate behavior "was inadmissible as lay testimony, under Federal Rule of Evidence 701, because it was based on 'specialized knowledge within the scope of Rule 702.'" As Ebron did not object to the challenged statements at trial, our review is for plain error. Wake, 948 F.2d at 1435.

The admissibility of opinions by lay witnesses is governed by Federal Rule of Evidence 701, which provides the following:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the

35

witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

"[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Yanez Sosa, 513 F.3d at 200 (citations omitted). "As explained by the Second Circuit, 'a lay opinion must be the product of reasoning processes familiar to the average person in everyday life.'" Id. (quoting United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005)). A lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury. United States v. Riddle, 103 F.3d 423, 428 (5th Cir. 1997). "[A]ny part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701." Yanez Sosa, 513 F.3d at 200. We begin our analysis of this issue by considering Ebron's challenge to Nylen's testimony.

First, we note that Nylen's statements are properly considered as lay opinion testimony. The apparent primary purpose of Nylen's testimony was to identify the various individuals captured in the surveillance footage. This type of testimony can be considered lay testimony. See Mueller at § 7.4 ("Lay witnesses who know a person, and usually that person is now the defendant in a criminal case, may testify that he is the one shown in the pictures and videotape made by surveillance cameras at banks and elsewhere. Such testimony is often useful in identifying robbers, burglars or assailants."). The admission of this testimony is therefore governed by Rule 701.

Given this classification, the next step in the analysis is to determine whether Nylen's lay testimony regarding the intent of Bacote's gesture satisfies

36

Rule 701. Because it is unhelpful to a clear understanding of his testimony or the determination of a fact in issue, we are unconvinced that it satisfies Rule 701's second requirement. Nylen's testimony regarding the intent of Bacote's gesture was not helpful to a clear understanding of his testimony. His testimony was useful in identifying individuals in the video–any interpretive gloss regarding the intent behind these individuals' gestures would not have helped the jury understand his testimony. Nor was the testimony helpful in determining a fact in issue–even if the parties disputed the intent of Bacote's gesture, whether the gesture was in fact a "thumbs up" is beyond Nylen's personal knowledge. Thus, Nylen's testimony regarding the meaning of Bacote's gesture should not have been admitted under Rule 701.

While inadmissible under Rule 701, the district court did not plainly err in admitting the challenged testimony. In stating that Bacote's gesture was a "thumbs up," Nylen was providing his subjective understanding of the intent behind Bacote's gesture. Because the permissible scope of a lay witnesses testimony regarding another person's mental state is sometimes unclear,[10] we conclude that the district court's error was not clear or obvious. Thus, under the applicable standard of review, the admission of the challenged portion of Nylen's testimony does not provide a basis for reversing Ebron's convictions.

Ebron's challenge to portions of the testimony provided by Powers, Wilson, and Rayburn is similarly unavailing. According to Ebron, the testimony provided by these officials regarding inmate behavior was inadmissible as lay testimony because it was based on specialized knowledge. Since it was based on specialized knowledge, Ebron contends that this testimony was expert testimony that should have been subjected to the rigors of Rule 702.

---

[10] Scholars have observed that, "it is very hard to say how far a lay witness should be allowed to go in interpreting the mental state of another–her knowledge, intent, understanding, or feelings, or what she meant by what she said." Mueller at § 7.4.

We are unconvinced by Ebron's position. "To be considered expert, testimony must involve more than 'common sense or the officers' past experience formed from firsthand observation.'" United States v. Jackson, 549 F.3d 963, 975 (5th Cir. 2008) (citation omitted). Here, the disputed testimony provided by Powers, Wilson, and Rayburn described various aspects of penitentiary life, prisoner behavior, and inmate-on-inmate violence. Based on their respective experiences, all three officials could have testified about these matters: Powers had been a unit officer who had observed inmate assaults; Wilson had experience investigating incidents where certain inmates were forced to request administrative segregation; and Rayburn had previously investigated and observed inmate violence. Because the testimony provided by these three officials was based on their past experiences formed from firsthand observation, it was properly admitted as lay testimony. In the past, this court has found that similar experiences and testimony satisfied Rule 701. See Jackson, 549 F.32d at 975 (holding that an official's testimony about inmate fighting practices was admissible because it was predicated upon prior investigations of prisoner violence). The district court therefore did not err in admitting the challenged testimony.

6.

In his final evidentiary challenge, Ebron disputes the admission of Brown's testimony regarding the manner in which Barnes was killed. He appears to make two distinct arguments challenging Brown's testimony. First, he contends that the district court erred in initially admitting Brown's testimony. According to Ebron, Brown's testimony was neither relevant nor reliable, and was thus inadmissible. Second, Ebron maintains that the district court erred in allowing Brown to go beyond the permitted scope of his testimony.

We review the admission or exclusion of expert testimony for an abuse of discretion. United States v. Valencia, 600 F.3d 389, 423 (5th Cir. 2010) (citing

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). "The district court's ruling will not be disturbed on appeal unless it is manifestly erroneous." Id. (citing United States v. Norris, 217 F.3d 262, 268 (5th Cir. 2000)). "If the court abuses its discretion, judgment will be affirmed under the harmless error doctrine unless the error affected a substantial right of the defendant." Id. (citation omitted). When a defendant fails to object to expert testimony that exceeds the scope of that permitted, review is for plain error. See id. at 428 (citation omitted).

> Federal Rule of Evidence 702 provides the following:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Under Federal Rule of Evidence 702, district courts are assigned a gatekeeping role to determine the admissibility of expert testimony." Valencia, 600 F.3d at 423-24 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993)). This gatekeeping role applies to all types of expert testimony, not just scientific testimony. Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002) (citation omitted). To be admissible under Rule 702, the court must find that the evidence is both relevant and reliable. Valencia, 600 F.3d at 424. (citation omitted). "The relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." Id. (citation omitted).

Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352 (5th Cir. 2007) (citation omitted). This

court has concluded that expert evidence can be reliable "where it [is] based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the scientific community." Pipitone, 288 F.3d at 247. Relevance, on the other hand, depends on whether the reasoning or methodology underlying the testimony can be properly applied to the facts in issue. Id. (citation omitted). Evidence is relevant if it assists the trier of fact to understand the evidence or to determine a fact in issue. Daubert, 509 U.S. at 591.

After considering Ebron's objection to the initial admission of Brown's testimony, we will then turn to evaluating Ebron's challenge to the scope of Brown's testimony. The former challenge has been preserved, while the latter has not. We will apply the appropriate standard of review to each putative error.

Because it is both relevant and reliable, the district court did not abuse its discretion in initially admitting Brown's testimony. Contrary to what Ebron argues, Brown's testimony is relevant. One of the central fact issues at trial was whether Ebron held Barnes during the assault. Brown's testimony is relevant because it helped the jury make a determination regarding this fact issue. While Ebron contends that Brown's testimony is irrelevant because it is speculative, we conclude that this attack misses the mark. Any such skepticism of Brown's testimony is an attempt to minimize its weight. It does nothing to undermine the relevance of Brown's testimony.

Ebron's attack on the reliability of Brown's testimony is also unpersuasive. An expert can provide testimony based on "his personal observations, professional experience, education, and training." Pipitone, 288 F.3d at 247. Here, Brown used his many years of experience as a forensic pathologist in providing his opinion regarding the cause and manner of Barnes's death. In arriving at his opinion, he relied on a couple of articulable facts, namely, the

cluster of stab wounds and the quantity and placement of defensive wounds. Contrary to what Ebron argues, the fact that Brown's testimony may be assailable does not mean it is inadmissible under Rule 702. The trial court's role as gatekeeper under Daubert is not intended to serve as a replacement for the adversary system. Pipitone, 288 F.3d at 250 (citation omitted). "[A]s Daubert makes clear, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596)).

In sum, Brown's testimony is both relevant and reliable for purposes of Rule 702. The district court therefore did not abuse its discretion in allowing Brown to testify. Moreover, after reviewing the record, we find no error, plain or otherwise, with respect to the scope of Brown's testimony.

C.

The third category of issues raised by Ebron involves allegations of prosecutorial misconduct. According to Ebron, the prosecution engaged in misconduct at both the guilt/innocence and sentencing phases of his proceedings. We will address the allegations regarding the guilt/innocence phase separate from the averments related to the sentencing phase. Before doing so, we will set forth the applicable legal framework for considering both sets of allegations.

The trial court's response to objected-to prosecutorial comments is reviewed for abuse of discretion. United States v. Rice, 607 F.3d 133, 138 (5th Cir. 2010). Plain error review applies to allegedly improper comments for which there was no contemporaneous objection. Id.; United States v. Davis, 609 F.3d 663, 677 (5th Cir. 2010).

We apply a two-step analysis to claims of prosecutorial misconduct. Fields, 483 F.3d at 358. For the first step, we must assess whether the prosecutor made an improper remark. Id. If the prosecution has made an

improper remark, we must then ask whether the defendant was prejudiced. Id. The prejudice step of the inquiry sets a high bar:

> Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected. A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.

United States v. Holmes, 406 F.3d 337, 355-56 (5th Cir. 2005) (citations and internal quotation marks omitted).

This court generally looks to three factors in deciding whether any misconduct casts serious doubt on the verdict: "'(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction.'" Mares, 402 F.3d at 515 (quoting United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1993)).

In assessing prejudice, "occurrences of prosecutorial misconduct ordinarily must be viewed individually." Fields, 483 F.3d at 358 (citing United States v. Wicker, 933 F.2d 284, 292 (5th Cir. 1991)). "'There may be instances where improper statements, which are not individually prejudicial enough to require reversal, could cumulate to affect the defendant's substantial rights. However, such instances are rare in this circuit.'" Id. (quoting Wicker, 933 F.2d at 292). "To warrant a new trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" United States v. Jimenez, 509 F.3d 682, 691-92 (5th Cir. 2007) (quoting United States v. Wyly, 193 F.3d 289, 299 (5th Cir. 1999)).

1.

Ebron points to five forms of alleged prosecutorial misconduct during the guilt/innocence phase of his trial. First, he argues that the prosecutor injected

his personal beliefs into the trial. Second, Ebron maintains that the prosecutor misrepresented evidence. Third, Ebron asserts that the government engaged in misconduct when it dehumanized him throughout the trial. Fourth, he contends that the government improperly insinuated that it had information that was not presented to the jury. And finally, Ebron argues that the prosecution engaged in misconduct when it read inadmissible evidence in front of the jury. We consider each contention in turn.

a.

Ebron begins this portion of his attack on his convictions by pointing to two instances where the prosecutor allegedly inserted his personal beliefs into the trial. He first directs our attention to the following portion of the government's closing argument:

> You've heard suggestions that some mysterious unknown male or even harmless old Charles Giles was the real killer. Set that aside. Joseph Ebron has confessed he was in the cell during the entire murder. You know that he was in there with Marwin Mosley, and you know and I know that that man helped subdue Keith Barnes while Mosley stabbed him to death.

Ebron specifically objects to the portion of the argument where the prosecutor used the phrase "you know and I know." According to Ebron, this statement was an improper attempt by the prosecutor to personally weigh in on the central dispute at trial.

In addition, Ebron highlights the following statement that was also made during closing arguments:

> You know, one thing I do agree with what Ms. Scardino said–you know, at first I thought that Joseph Ebron killed Keith Barnes just to do a favor for his friend Rat; but I don't think it's just that now. I think he killed him just as much for Joseph Ebron.

Since Ebron did not object to either argument at trial, we are limited to reviewing the district court's response to both arguments for plain error. See

Rice, 607 F.3d at 138. Under this standard of review, neither statement can serve as the basis for granting Ebron the relief he is seeking.

With respect to his first challenged statement, we are unconvinced that it was plainly improper. We interpret "you know and I know" as the functional equivalent of saying "we know." Interpreted as such, Ebron's challenge to this statement in the prosecution's closing argument is unsuccessful.

Although the use of the phrase "we know" in jury arguments has been criticized and discouraged, it is not always improper. United States v. Bentley, 561 F.3d 803, 811 (8th Cir. 2009); United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005) ("We do not condone the prosecutors' use of 'we know' statements in closing argument, because the use of 'we know' readily blurs the line between improper vouching and legitimate summary."). As the Eighth Circuit has observed, the use of "we know" is only "improper when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility." Bentley, 561 F.3d at 812 (citations omitted). Like the phrase "we know," the phrase "you and I know" is not per se improper. And given the context in which the phrase was used, we are unconvinced that the prosecutor's reliance on the phrase in this case was plainly improper. As used in the government's closing argument, we are unpersuaded that the statement obviously crossed the line between legitimate summary and improper vouching.

The second challenged portion of the government's closing argument also does not provide a basis for granting Ebron relief. Even if we were to assume that the argument was plainly improper, Ebron was not prejudiced by it. When considered in the context of the entire body of evidence that was presented at trial, it is evident that there is no reasonable probability that the result of Ebron's trial would have been different but for this statement. Stated differently, the prosecution's argument did not prejudice Ebron. See United

States v. Gonzalez-Rodriguez, 621 F.3d 354, 363-64 (5th Cir. 2010) (holding that an error affects a defendant's substantial rights only if the error was prejudicial, and that an error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error). Thus, neither this nor the previous statement provide a basis to grant Ebron relief.

b.

Ebron's second allegation of prosecutorial misconduct at the guilt/innocence phase involves the misrepresentation of evidence. To address this argument, we need not determine whether such behavior occurred: the parties agree that the prosecution misrepresented evidence at trial. Specifically, on appeal the government concedes that it misrepresented Ebron's testimony on who exactly referred to him as Akhee while he and Mosley were in Barnes's cell. Contrary to what the prosecution stated at trial, it was Barnes, not Bacote, who referred to Ebron as Akhee.

The prosecution's mischaracterization of Ebron's testimony, however, does not provide a basis for us to vacate his convictions. During deliberations, the jury asked for various portions of Ebron's testimony and specifically requested the part "where [Ebron] is introduced to Barnes as 'Akh.'" Because the transcript was unavailable, the entirety of Ebron's testimony was read back to the jury. Given the nature and specific wording of their request, the jury appeared to have wanted to verify the government's assertion that it was Bacote who referred to Ebron as Akhee. The jury's opportunity to rehear and clarify the evidence, combined with the instructions provided by the district court,[11] convinces us that the prosecution's mischaracterization of the evidence did not prejudice Ebron. Thus, we decline to vacate his convictions on this ground.

---

[11] The district court instructed jurors that "any statements, objections, or arguments made by the lawyers are not evidence." We must assume that jurors follow their instructions. Zafiro, 506 U.S. at 540.

c.

Along with his first two accusations of prosecutorial misconduct at the guilt/innocence phase, Ebron also contends that the prosecution engaged in misconduct when it stated the following during closing argument:

> And let me say this about that. Lions and tigers in the jungle do not stalk animals they're not going to kill, and what we saw on that videotape was nothing less than predators stalking someone who was about to be killed.
>
> Remember this picture (indicating)? What do we see here, ladies and gentlemen? We see two predators set up, prestaged, ready to go kill their quarry.

Ebron suggests that this argument impermissibly alluded to his race and dehumanized him. Again, given the lack of a contemporaneous objection, the plain error standard of review applies. See Rice, 607 F.3d at 138.

This circuit has stated that the use of colorful pejoratives is not improper. Fields, 483 F.3d at 360. And while there may be situations where pejoratives are so inflammatory that they substantially affect a defendant's right to a fair trial, this is not one of those cases. As the Supreme Court has observed, "[t]he line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." United States v. Young, 470 U.S. 1, 7 (1985). The challenged portions of the government's closing argument falls in this gray zone. Given that the inappropriateness of the prosecutor's use of metaphor and reliance on the word "predator" is unclear, we are convinced that there is no reasonable probability that the result of Ebron's trial would have been different but for the use of these rhetorical devices. This challenge therefore also fails to provide a basis for us to reverse Ebron's convictions.

d.

Ebron also asserts that the guilt/innocence phase of his trial was tainted by the prosecution's improper bolstering. This assertion is based on arguments

made by the prosecution regarding the surveillance video that was shown to the jury.

At trial, the parties disputed whether the surveillance video depicted Ebron handing Mosley a shank. In closing, Ebron's counsel argued the following:

> You know, much of the government's case, it seems to me, is conjecture and speculation. One example is, "I saw your hand over by Mr. Mosley's hand; so, you must be handing him a knife." Now, you know, try as I could, I saw no flash. I saw no knife. I didn't see Mr. Mosley put something around his arm and stuff it up his sleeve. That's what I mean by speculation.

During rebuttal, the government replayed the disputed portion of the surveillance tape. As the video was playing, the prosecutor began narrating as if he were Mosley:

> So, I'm going to put my towel on my head; and Mr. Ebron is going to hand me something right there. And he kind of insinuated it might have been those pictures he was talking about, but let's see what happens in the next frame.
>
> Okay. Now he's behind the pillar. Take a look at his hand right here (indicating). When you go back, if you want, go ahead and look at this tape. Blow it up as large as you can. And tell me that it's not possible that that's a pointed object right in Mr. Mosley's hand right here (indicating).

On appeal, Ebron argues that the prosecutor's recommendation that the jury "blow up" the video was improper. According to him, "the prosecutor's invitation to 'blow up' the videotape suggested to the jury that he had information unavailable to it and, in effect, permitted the prosecutor to bolster his case by suggesting he knew something the jury did not." Since there was no contemporaneous objection to this argument, the plain error standard of review applies. See Rice, 607 F.3d at 138.

47

Ebron's challenge to the government's rebuttal argument is futile for two reasons. First, the district court did not plainly err in allowing this argument. This line of argumentation was presented in response to a comparable argument made by defense counsel. Contrary to what Ebron asserts, the prosecutor's argument did not suggest that he had information outside of what was available to the jury. Rather, he, like defense counsel, was arguing for a particular interpretation of the evidence. This argument was therefore not clearly improper. Second, Ebron was not prejudiced by the government's rebuttal argument. Given the evidence submitted by the government, there is no reasonable probability that the outcome of his trial would have been any different in the absence of the challenged argument. Thus, we conclude that Ebron's challenge to the government's rebuttal argument does not provide a basis for unsettling his convictions.

e.

As his final allegation regarding prosecutorial misconduct during the guilt/innocence phase, Ebron asserts that the government engaged in misconduct when it read an inadmissible piece of evidence to the jury during Carpenter's cross-examination. The following is an excerpt of the relevant portion of the trial transcript:

> By Prosecutor:
> Q. Mr. Carpenter, I'm going to read this quote to you and ask you if you remember having heard it before. It says: The defendant did speak with me in general. I found him to be very articulate, innately intelligent, and artfully cunning. The defendant is one of the brightest prisoners, educated or uneducated, that I have encountered in my more than 20 years –
>
> Defense Counsel: Your Honor, excuse me. May we know what he's reading from? I mean, obviously he's reading from a document.

The Court: Well, let me – he can finish reading it at least.

By Prosecutor (Reading):
The defendant is one of the brightest prisoners, educated or uneducated, that I have encountered in my more than 20 years of dealing with criminals in this city. The latter in and of itself is all right; but when such innate abilities are possessed by someone who appears to be suffering from megalomania, therein lies the makings for great mischief–

Defense Counsel: Your Honor, I object. It's hearsay. I mean, I don't –

The Court: I don't know what you're doing at this point.

Prosecutor: I'm asking him if he's heard those words before.

The Court: What are you reading from?

Prosecutor: I'm reading from his Presentence Report, your Honor.

The Court: How much more is there to quote?

Prosecutor: That's it.

The Court: All right.

By Prosecutor:
Q. Have you heard those words used to describe you before?

A. No, sir.

Q. You don't remember reading them in your Presentence Report when you were sentenced for felony murder?

A. No, sir.

Because defense counsel objected to the reading of Carpenter's PSR, our review is for abuse of discretion. See Rice, 607 F.3d at 138.

As stated earlier, the prejudice portion of the inquiry into claims of prosecutorial misconduct sets a high bar. See Holmes, 406 F.3d at 356. To constitute reversible error, the prosecutorial misconduct must cast serious doubt on the correctness of the jury's verdict. See id. Here, even if we were to assume that the government's actions were improper, the reading of the excerpt from Carpenter's PSR does not cast a serious doubt on the correctness of the jury's guilty verdict. Placed in the context of the government's theory of the case, the information in the PSR seems to support some notion that Carpenter, consistent with his cunning and megalomaniacal personality, had specifically ordered Barnes's execution. But given the several other pieces of evidence establishing a separate, but related, motive for Ebron to kill Barnes–namely, his strong personal relationship with Carpenter–this information did not provide evidence for a portion of the government's case that had not already been adequately substantiated. Stated differently, the read excerpts of the PSR were superfluous in establishing a motive for Ebron's actions. As such, the presentation of this evidence does not cast doubt on the jury's verdict. Ebron therefore was not prejudiced. Accordingly, this contention cannot be the basis for reversing Ebron's convictions.

2.

In addition to his allegations regarding the guilt/innocence phase, Ebron asserts that the government engaged in acts of misconduct during his sentencing proceedings. Specifically, he claims that the prosecution engaged in misconduct when it demeaned defense counsel in front of the jury. Ebron also asserts that the following five arguments made by the government were improper and inflammatory: "(1) that the jury must sentence [him] to death to send a message to prison gangs; (2) that a life sentence would be no punishment; (3) that [he] was an 'animal'; (4) that it was the jury's job to impose a death sentence; and (5)

that death was required because the [Bureau of Prisons] would not keep [him] segregated indefinitely." We consider each argument in turn.

a.

On appeal, Ebron points to several instances where he alleges that the prosecution denigrated defense counsel in front of the jury. For example, he asserts that the prosecution's use of sarcasm was impermissible. Ebron fails, however, to develop any legal argument regarding why, under the applicable standard of review, the prosecution's actions justify relief from his sentence. We therefore reject Ebron's attempt to undermine his sentence on this basis.

b.

Ebron next turns his attention to various arguments the prosecution made before the jury. To begin, Ebron contends that two arguments made by the prosecution improperly urged the jury to return a death sentence. First, he points to the following argument:

> He doesn't receive the death penalty, he gets away with it. He gets a pass. He's right back where he was. . . . He'll be back on the general compound, and this will be of no consequence. He will be received back into the DC crew. He will not be suffering from a death penalty. He will be exactly where he was before he did this, a person serving life. That did not deter him from doing this, and there will be no message to the DC crew or prison community that this behavior is not acceptable.

Second, Ebron draws attention to the following:

> What message would a life sentence send to Joseph Ebron's crew and the prison community? It would send the wrong message, without a doubt. That message would be: Carry on with your killings. No punishment will be waiting for you when you do.

According to Ebron, these arguments constituted prosecutorial misconduct because they were inflammatory and unfair. Because Ebron did not object to

them at trial, our review of these arguments is for plain error. Rice, 607 F.3d at 138.

These arguments appear to have been designed to call on the jurors to act as the conscience of the community. "This circuit has held that appeals to the jury to act as the conscience of the community are permissible, so long as they are not intended to inflame." United States v. Fields, 72 F.3d 1200, 1208 (5th Cir. 1996). Indeed, this court has previously held that "'[a]lthough the prosecution may not appeal to the jury's passions and prejudices, the prosecution may appeal to the jury to act as the conscience of the community.'" Davis, 609 F.3d at 688 (quoting Jackson v. Johnson, 194 F.3d 641, 655 & nn.54-56 (5th Cir. 1999)). Even in capital sentencing proceedings, it has been recognized that the government has "'a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'" Jones v. United States, 527 U.S. 373, 382 (1999) (quoting Lowenfield v. Phelps, 484 U.S. 231, 238 (1988)).

The challenged arguments here were not clear appeals to the jury's passions and prejudices. Nor were they plainly intended to inflame the jury. Instead, these arguments appeared to have invited the jury to take on the permissible task of acting as the conscience of the community on the question of the appropriate sentence for Ebron. Thus, under the applicable standard of review, this specific challenge to his sentence is unavailing.

c.

Ebron's next challenge is related. In it, he contends that the prosecution engaged in misconduct when it argued that a life sentence would be no punishment for him given his status as an inmate who was already serving a

long sentence. Given that Ebron lodged an objection to this argument at trial, our review is for abuse of discretion. Rice, 607 F.3d at 138-39.

At trial, the prosecution did indeed argue that if Ebron did not receive the death penalty he would have received a "pass," and that Barnes's homicide would have been a "free murder." In the past, we have noted that "[c]ourts have divided on the question of whether such an argument is permissible." Davis, 609 F.3d at 687 (citations omitted). Here, the district court's response to the prosecution's argument was not an abuse of discretion for one simple reason: it sustained Ebron's objections to this argument. While perhaps more could have been done by the district court to mitigate the potential impact of this objectionable argument, Ebron did not ask for additional measures to be taken. Thus, Ebron's attempt to undermine his sentence on this ground is unsuccessful.[12]

d.

As in his arguments regarding misconduct at the guilt/innocence phase of his trial, Ebron contends that the prosecution dehumanized him and invited racial bias into the sentencing phase of his trial when it made certain comments about him. Specifically, he objects to (1) a government question that implicitly referred to Ebron as a shark; (2) the prosecution's reference to Ebron as the "grim reaper"; and (3) the prosecution's use of a variation of the idiom, "can a

---

[12] Briefly, we note that Ebron's reliance on Sumner v. Shuman, 483 U.S. 66 (1987), is unpersuasive. In his brief, Ebron uses Sumner to support the proposition that the "Supreme Court has expressly rejected the validity of the argument the prosecutor made in this case." Sumner, however, did no such thing. Rather, Sumner struck down a state statute that imposed a mandatory death sentence for prison inmates convicted of murder while serving a life sentence without the possibility of parole. 483 U.S. at 67-69. The Court did this on the ground that the statute impermissibly departed from the individualized capital sentencing doctrine and therefore could not be reconciled with the demands of the Eighth and Fourteenth Amendments. Id. at 78. The significant differences between what was at issue in Sumner and what is at issue here renders Ebron's reliance on Sumner unpersuasive.

leopard change its spots."  Ebron did not lodge objections to these statements at trial.  Review is therefore limited to plain error.  See Rice, 607 F.3d at 138.

Like the comparable comments addressed above, any error relating to the challenged comments made during Ebron's sentencing is not plain.  Colorful pejoratives are not improper.  Fields, 483 F.3d at 360.  And while at some point pejoratives go from being colorful to inflammatory, it is unclear whether the challenged comments are on the wrong side of the spectrum.  Because these comments were not plainly improper, they cannot be the basis for granting Ebron any relief from his sentence.

e.

Along with his previous four general allegations of prosecutorial misconduct at the sentencing phase, Ebron also argues that the government engaged in misconduct when it used the phrase "your job" when arguing before the jury.  Review is limited to plain error because Ebron did not object to the challenged phrase at trial.  See Rice, 607 F.3d at 138.

According to Ebron, the government used this choice of words on two occasions.  On the first occasion, the government stated the following:

> You are to give a careful and reasoned decision based on the law and the evidence, not on passion, not on sympathy, not on being guilted into "I don't want this on my conscience."  Every single one of you knew that there was a chance that you would be in the chairs that you are listening to what I'm telling you right now; and every one of you said that if the law and the evidence showed you that it was just and right to vote for the death penalty, that you would do your job and vote that way.

On the second occasion, the government argued:

> Please remember that as you sit there impaneled as a jury, you represent justice, justice made manifest.  Not theoretical, not hypothetical, but justice in the flesh.  As I mentioned, justice to this point for Keith Barnes has been delayed; and justice delayed is justice denied.

54

Joseph Ebron must answer for the killing of Keith Barnes. Your job is to deliver that justice, that delayed justice. Weigh the factors that justice requires. When you do, you will, I submit, conclude, as I said, that the aggravating factors outweigh the mitigating. I submit that you will conclude that death is the only appropriate sentence in this case.

In response to Ebron's argument, the government concedes that, under the Supreme Court's decision in United States v. Young, 470 U.S. 1 (1985), it was improper for the prosecutors to refer to the juror's "job." Even if we were to accept this concession and conclude that these references were plainly improper, the use of the challenged phrase does not provide a reason to vacate Ebron's sentence. Put simply, Ebron was not prejudiced by the prosecution's use of the phrase "your job." When the challenged phrase is considered in the context of the prosecution's argument as a whole and evaluated in light of the evidence presented by the government, we see no reasonable probability that the result of Ebron's sentencing proceeding would have been different but for the government's use of the challenged phrase. Thus, we conclude that Ebron cannot rely on the prosecution's use of the phrase "your job" to obtain relief from his sentence.

f.

As stated earlier, Ebron's future dangerousness was at issue during his sentencing proceeding. Whether the Bureau of Prisons could impose conditions of confinement that would effectively prevent Ebron from committing future acts of violence was thus also at issue. During Ebron's sentencing, both sides presented experts supporting their respective positions regarding Ebron's potential conditions of confinement: Ebron's expert, Jim Aiken, testified that prison officials would be able to place inmates in the "right place" for an extended amount of time in order to protect other inmates and staff; in contrast, the government's expert, Greg Hershberger, suggested that Ebron would

potentially be moved from special conditions of confinement back into the general population within six years.

In closing, the government argued that Ebron posed a future danger. To support this argument, the prosecution suggested that inmates serving life sentences could be isolated from others only temporarily. As such, the government indicated that Ebron would have the opportunity to commit criminal acts of violence in the future. The prosecution specifically argued as follows:

> Is he likely to commit criminal acts of violence in the future? Not – this is not a search to decide whether he'll kill somebody again, although I would suggest to you that it wouldn't be a stretch to think that he might. This is simply will he commit another criminal act again. And, folks, this is not a "will." This is a "when."

> He's going to be out in the general population at a United States prison again. If he gets a life sentence, he is going to be right back where he was when he killed Keith Barnes. So, it's not a question of whether he's likely to but simply a question of when is he going to do it next.

In his final challenge related to prosecutorial misconduct, Ebron contends that "[t]his argument was misconduct, because it invited the jurors to decide that Ebron should be executed on the basis of decisions that were in the BOP's, not Ebron's, hands." According to Ebron, "[b]asing a death sentence on the BOP's alleged unwillingness to keep [him] segregated indefinitely is incompatible with the core legal principle that the selection of a sentence in a capital trial" must be an individualized determination on the basis of the character of the individual and the circumstances of the crime. Again, because there was no contemporaneous objection to the prosecution's argument, our review is for plain error. See Rice, 607 F.3d at 138.

The government's argument was not plainly improper. In his brief, Ebron fails to provide legal authorities establishing the inappropriateness of the argument he is now challenging. In the absence of such authorities, we are

unable to conclude that the district court plainly erred in allowing this argument. Ebron's challenge to his sentence on this ground is therefore unavailing.

D.

In his fourth category of issues, Ebron maintains that during his sentencing proceedings, the district court: (1) improperly submitted two aggravating factors to the jury; (2) abused its discretion in allowing the testimony of two witnesses; (3) permitted hearsay evidence in violation of the Confrontation Clause; (4) plainly erred in not concluding that his death sentence violated the Eighth Amendment and the Federal Death Penalty Act; and (5) plainly erred in failing to conclude that its instructions on the burden of proof violated the Sixth and Eighth Amendments. We consider each set of arguments separately.

1.

Ebron argues that the district court erred in submitting two aggravating factors to the jury during the eligibility phase of his trial. First, Ebron contends that the district court erred in submitting an instruction that asked the jury to consider whether he committed his offense in a "heinous, cruel, or depraved manner." Second, Ebron argues that the district court erred in asking the jury to decide whether he committed the offense after substantial planning. Ebron asserts that the murder was planned by others and that, at most, he was informed about, and acted in accordance with, the plans of others. For this reason, he concludes that "the evidence did not support submitting to the jury the question whether [he] had engaged in 'substantial premeditation and planning.'" Before examining these contentions, we set forth some necessary background.

Under the Federal Death Penalty Act ("FDPA"), conviction of an offense punishable by death is followed by a separate sentencing hearing which involves

both an eligibility and selection phase. See United States v. Williams, 610 F.3d 271, 284 (5th Cir. 2010). During the selection phase, aggravating and mitigating factors are considered, and the jury has the option of recommending a sentence of death, life imprisonment without possibility of release, or a lesser sentence determined by the district court. Id. (citing 18 U.S.C. § 3593(e)). Before such a recommendation may be made, however, the jury must first address the eligibility phase where it considers whether the defendant is within the category of individuals who are eligible for the death penalty. As relevant here, the eligibility phase of an FDPA sentencing proceeding requires the jury to "unanimously find beyond a reasonable doubt at least one of four threshold intents and at least one statutory aggravating factor rendering the defendant eligible for a death sentence." Id. (citing 18 U.S.C. §§ 3591(a)(2), 3592(c) & 3593(e)(2)).

The FDPA sets forth sixteen statutory aggravating factors for homicide. See 18 U.S.C. § 3592(c). It also allows the jury to "consider whether any other aggravating factor for which notice has been given exists." Id. "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt." 18 U.S.C. § 3593(c). A finding with respect to any aggravating factor must be unanimous. Id. at § 3593(d). If no statutory aggravating factor is found to exist, the FDPA states that "the court shall impose a sentence other than death authorized by law." Id.

Along with these aggravating factors, a jury must also consider mitigating factors in determining whether a defendant will be sentenced to death. 18 U.S.C. § 3592(a). "The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information." Id. at § 3593(c). "A finding with respect to a mitigating factor may be made by 1 or more members

of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established." Id. at § 3593(d).

If both the requisite intent and at least one of the statutory factors is found to exist, then the jury may proceed to the selection phase. In this phase, the jury considers whether the proven aggravating factors sufficiently outweigh the established mitigating factors to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factors alone are sufficient to justify a death sentence. 18 U.S.C. § 3593(e). "The weighing is not numeric; the perceived significance, not the number, of aggravating and mitigating factors determines the decision." Jones, 527 U.S. at 408. After engaging in this weighing process, the FDPA states that the jury by unanimous vote "shall recommend whether the defendant should be sentenced to death, to life imprisonment without the possibility of release or some other lesser sentence." 18 U.S.C. § 3593(e)

In this case, the district court provided the following three statutory aggravating factors to the jury: (1) having a "[p]revious conviction of offense for which a sentence of death or life imprisonment was authorized"; (2) "heinous, cruel, or depraved manner of committing offense"; and (3) "substantial planning and premeditation." See 18 U.S.C. § 3592(c). The jury was also asked to consider the following two nonstatutory aggravating factors: (1) "Defendant Joseph Ebron's motive for the murder of Keith Barnes was Barnes' past cooperation and testimony in the prosecution of Barnes' co-defendants"; and (2) "Joseph Ebron poses a continuing danger to the lives and safety of others while incarcerated because it is likely that he will commit criminal acts of violence in the future." With this legal and procedural background in mind, we now turn to considering Ebron's arguments.

a.

At the end of the eligibility phase, the district court provided the following description of the heinousness aggravating factor:

The defendant committed the offense charged in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Keith Barnes. To find the existence of the second statutory aggravating factor, you must unanimously find that the government has proved beyond a reasonable doubt that the defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved either torture or serious physical abuse to the victim.

Torture includes severe mental as well as physical abuse. For such abuse to amount to torture, the victim must have been conscious of it at the time it was inflicted. Further, the defendant must have specifically intended to inflict severe mental or physical pain upon the victim, apart from killing the victim.

On the other hand, serious physical abuse may be inflicted regardless of whether the victim is conscious of the abuse at the time it was inflicted. The defendant, however, must have specifically intended the abuse apart from the killing. "Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

On appeal, Ebron contends that the district court erred in submitting this instruction to the jury. According to him, the district court erred because the government did not present sufficient evidence establishing (1) that physical abuse or torture was involved in Barnes's murder; and (2) that he specifically intended that Barnes be subjected to physical abuse or torture. Although he frames it as an error on the part of the district court in submitting this instruction to the jury, what he is actually challenging is the jury's conclusion

with respect to this aggravating factor. We will thus consider his challenge in the latter manner.

We review "jury findings of aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." United States v. Bernard, 299 F.3d 467, 481 (5th Cir. 2002) (citation omitted). Ebron's two aforementioned arguments seeking to undermine the validity of this aggravating factor are unsuccessful under this standard of review.

First, based on the evidence presented, a rational trier of fact could have concluded, beyond a reasonable doubt, that serious physical abuse was involved in Barnes's murder. "For serious physical abuse to be aggravating in a murder case, a defendant must inflict suffering or mutilation above and beyond that necessary to cause death." United States v. Agofsky, 458 F.3d 369, 374 (5th Cir. 2006) (citation omitted). As was established at trial, Barnes was stabbed 106 times by a sharp, round instrument in an eight-inch by four-inch area over his heart, left lung, and liver. Viewing the evidence in the government's favor, it is evident that any rational trier of fact could have concluded Ebron and Mosley inflicted a considerable amount of damage to Barnes's body which, in turn, impaired the function of Barnes's heart. Not only that, it is also evident that this same trier of fact could have determined that the mutilation of Barnes's body went above and beyond what is necessary to cause death. As such, we are unpersuaded by Ebron's contention that Barnes's murder did not involve serious physical abuse.

Second, contrary to what Ebron argues, a rational trier of fact could have also concluded that Ebron specifically intended that Barnes be subjected to serious physical abuse. Based on the number of stab wounds, the testimony indicating that Ebron and Mosley had to take breaks as they assaulted Barnes,

61

and testimony by Rayburn which indicated that the assault appeared to have been a message to the rest of the inmate population, any rational trier of fact could have concluded that Ebron intended to subject Barnes to serious physical abuse.

In short, Ebron's challenge to the jury's conclusion with respect to this aggravating factor is unsuccessful.[13]

b.

We now turn to considering Ebron's challenge to the submission of the substantial planning aggravating factor to the jury. Before discussing this statutory factor, we will set forth our standard of review.

Because "[d]istrict courts enjoy substantial latitude in formulating a jury charge . . . we review all challenges to, and refusals to give, jury instructions for abuse of discretion." United States v. Webster, 162 F.3d 309, 321-22 (5th Cir. 1998). In conducting this review, we consider whether the instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them. See United States v. Whitfield, 590 F.3d 325, 347 (5th Cir. 2009) (citation omitted).

The FDPA establishes the following aggravating factor:

> (9) Substantial planning and premeditation.—The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

18 U.S.C. § 3592(c)(9).

Given that the FDPA's statutory aggravating factors focus primarily on the defendant's actions in committing the underlying offense and his individual

---

[13]   Even if we were to consider this challenge as an attack on the initial submission of this aggravating factor to the jury, Ebron would still not be entitled to relief.

criminal history,[14] a proper reading of this statutory language would require the jury to consider the defendant's substantial planning, and not that of any other individual, in determining whether this aggravating factor has been satisfied.[15] In light of this understanding of the statutory language, we conclude that the district court abused its discretion by having the jury deliberate on principles of law that were inapplicable to the facts before them.

The record in this case shows that Ebron did not engage in any planning, let alone any substantial planning. As Sherman's testimony made clear, Ebron was not a part of the planning of Barnes's murder–Mosley, Sherman, and Bacote were the individuals who did the planning. In defending the inclusion of this statutory factor, the government contends that Ebron engaged in substantial planning by acting in conformance with the plan that was developed by Mosley, Sherman, and Bacote. This, of course, is not enough. As stated above, it is the defendant's substantial planning, and not that of any other individual, that matters in determining whether this aggravating factor has been satisfied. Because there are no facts supporting the notion that Ebron engaged in substantial planning, the district court abused its discretion in submitting this aggravating factor to the jury.

In the end, however, the district court's decision to submit this aggravating factor to the jury does not provide a basis for vacating Ebron's

---

[14] For example, a number of these statutory aggravating factors allow the jury to consider some of the defendant's prior convictions. See, e.g., 18 U.S.C. § 3592(c)(3) (allowing consideration of a "[p]revious conviction of offense for which a sentence of death or life imprisonment was authorized"). Others permit the consideration of specific aspects of the defendant's actions in committing the underlying offense. See, e.g., id. at § 3592(c)(8) (allowing consideration of whether the "defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value"). The FDPA's statutory factors do, however, also permit consideration of factors that are not centered on the defendant's actions in committing the underlying offense or his individual criminal history. See id. at § 3592(c)(11) (permitting consideration of the vulnerability of the victim).

[15] The parties do not dispute that this is the proper interpretation of this statutory aggravating factor.

sentence. When a jury finds an invalid aggravating factor, an appellate court must strike the invalid factor and then either reweigh the remaining aggravating factors against the mitigating evidence or apply harmless error review. United States v. Jones, 132 F.3d 232, 251 (5th Cir. 1998). "If the appellate court chooses to reweigh the remaining aggravating factors against the mitigating evidence, the court must determine what the jury would have done absent the invalid aggravating factor." Id. (citation omitted). "On the other hand, if the appellate court chooses to apply harmless error review, then the harmless error analysis can be applied in the following two ways: First, the appellate court may inquire into whether, beyond a reasonable doubt, the death sentence would have been imposed had the invalid aggravating factor been properly defined in the jury instructions." Id. at 251-52 (citations omitted). "Second, the appellate court may inquire into whether, beyond a reasonable doubt, the death sentence would have been imposed absent the invalid aggravating factor." Id. at 252. "[A]n appellate court can choose to apply any of the available forms of review so long as the defendant receives an individual determination of the propriety of his death sentence." Id. Here, we choose to apply harmless error review.

Applying this scope of review, we conclude that, beyond a reasonable doubt, the death sentence would have been imposed absent the invalid statutory aggravating factor. After removing the invalid factor, the jury would have still had two statutory aggravating factors before it–the heinousness factor and the stipulated prior serious conviction factor–along with the motive and future dangerousness nonstatutory factors. In terms of mitigating factors, at least one juror found that ten of the thirty-five mitigating factors submitted by Ebron had been adequately proven. But despite the existence of these mitigating factors, we are convinced that the jury would have imposed the death penalty even without the substantial planning aggravating factor. In its argument at the

conclusion of the selection phase, the prosecution did not rely upon the substantial planning aggravating factor in arguing for the death penalty. Rather, the government relied upon Ebron's future dangerousness in making its argument that death was an appropriate sentence. Given the lack of emphasis on this factor, we are unconvinced that the inclusion of the substantial planning aggravating factor affected the jury's conclusion. Indeed, even without the improperly submitted factor, Ebron's death sentence is firmly supported by his serious criminal history, the heinousness of the crime, his future dangerousness, and his motive in participating in Barnes's murder. In short, because we conclude that the jury would have imposed the death sentence absent the invalid statutory aggravating factor, Ebron is not entitled to relief. See Jones, 132 F.3d at 252 ("If the government establishes that an error regarding aggravating factors is harmless beyond a reasonable doubt, then the appellate court may not reverse or vacate the death sentence, unless of course such error rises to the level of a denial of constitutional rights.").

2.

In addition to his jury instruction challenges, Ebron contends that the district court abused its discretion in allowing certain portions of the testimony of Detective Lorren Leadmon and Peter Zeidenberg. Before addressing each of these contentions, we first set forth the legal framework that governs our analysis.

A district court has considerable discretion in controlling the presentation of the information to the jury in both content and form during an FDPA sentencing hearing. United States v. Hall, 152 F.3d 381, 397 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000) (internal quotation marks and citation omitted). A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. Yanez Sosa, 513 F.3d at 200.

65

"The Federal Death Penalty Act provides for a relaxed evidentiary standard during the sentencing hearing in order to give the jury an opportunity to hear all relevant and reliable information, unrestrained by the Federal Rules of Evidence." Jones, 132 F.3d at 241. Specifically, the FDPA provides the following:

> The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. . . . The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death.

18 U.S.C. § 3593(c).

As this statutory language indicates, "the defendant and the government may introduce any relevant information during the sentencing hearing limited by the caveat that such information be relevant, reliable, and its probative value must outweigh the danger of unfair prejudice." Jones, 132 F.3d at 241.

a.

In 1994, Ebron pleaded guilty to a second-degree murder charge. The underlying crime involved a situation where Ebron allegedly handed a gun to his best friend, Callie Swann, who then shot and killed an individual named Arthur Steve. Lorren Leadmon investigated Steve's murder.

During the selection phase of Ebron's trial, Leadmon, over a defense objection, testified and suggested that he thought that it was Ebron, and not Swann, who had pulled the trigger and killed Steve. On appeal, Ebron

challenges the district court's decision to allow Leadmon to provide his opinion regarding Steve's murder. He contends that the district court's decision was incorrect because (1) it permitted the admission of evidence that was inadmissible under Federal Rule of Evidence 701; and (2) it allowed testimony that is "egregiously and prejudicially improper" into a capital proceeding.

The district court did not abuse its discretion in allowing the challenged portions of Leadmon's testimony. Two reasons support this conclusion. First, contrary to what Ebron suggests, the Federal Rules of Evidence do not apply to FDPA sentencing hearings. Ebron's Rule 701 argument is thus unpersuasive. Second, Ebron opened the door to the line of questioning that resulted in the challenged testimony. On cross-examination, Ebron sought to use Leadmon to bolster his credibility by painting himself as cooperative during the investigation of Steve's murder. On redirect, the government was arguably permitted to continue down the line of inquiry that Ebron had initiated. See United States v. Walker, 613 F.2d 1349, 1353 (5th Cir. 1980) ("Because the defendants opened the door to this line of questioning, the government's questions on redirect were permissible."). When it pursued this line of inquiry, Leadmon provided his opinion regarding what took place in 1994 in order to establish that Ebron was not, in fact, cooperative. Given this conclusion, we are unconvinced that the district court abused its discretion in allowing the government's questioning of Leadmon and permitting the resulting testimony.

b.

As stated earlier, the government submitted the following nonstatutory aggravating factor to the jury: "Defendant Joseph Ebron's motive for the murder of Keith Barnes was Barnes' past cooperation and testimony in the prosecution of Barnes' co-defendants." To support this factor, the government sought to introduce various exhibits through the testimony of Peter Zeidenberg. Many of these exhibits were letters from Barnes that were written while he was in

prison. Over Ebron's relevance objection, the district court allowed Zeidenberg's testimony for this purpose.

On appeal, Ebron argues that the district court abused its discretion in allowing Zeidenberg's testimony. According to Ebron, Zeidenberg's testimony was irrelevant to the issues the jury had to decide at the selection phase. We disagree. Zeidenberg's testimony was relevant in determining whether Ebron helped murder Barnes because Barnes testified against Carpenter. Specifically, Zeidenberg's testimony established the following relevant points: (1) Barnes was scared of Carpenter; (2) Barnes was receiving threats from other D.C. inmates that made him feel like his life was in jeopardy; and (3) Barnes was beaten up by D.C. inmates; and (4) D.C. inmates were targeting Barnes because he had cooperated with the government. Considered in conjunction with the testimony provided during the other phases of the trial, this evidence was relevant for purposes of determining whether Ebron, like the other D.C. inmates described in Barnes's letters, was motivated to harm Barnes because he had testified against his codefendants. The district court therefore did not abuse its discretion in admitting this testimony over Ebron's objection.

3.

Turning to his constitutional arguments, Ebron contends that hearsay statements offered against him during the selection phase violated the Confrontation Clause. In making this contention, Ebron recognizes that this argument is foreclosed by circuit precedent. See Fields, 483 F.3d at 325-26 ("After reviewing the applicable caselaw and considering the particular importance of 'individualized sentencing' in capital cases, we conclude that the Confrontation Clause does not operate to bar the admission of testimony

relevant only to a capital sentencing authority's selection decision."). We therefore need not go any further to reject this argument.

4.

Moving on to a separate constitutional challenge to his sentence, Ebron argues that, "[u]nder the unique circumstances of this case, the death sentence imposed upon [him] is arbitrary, unfair, and disproportionate, in violation of the Eighth Amendment." As support for this assertion, Ebron points to the fact that Mosley, Bacote, and Sherman were not sentenced to death for their participation in Barnes's murder. Ebron argues that the difference between his punishment and that of Mosley, Bacote, and Sherman violates the Eighth Amendment. In addition, he maintains that his death sentence violates the FDPA because it was imposed under an "arbitrary factor." This arbitrary factor, he asserts, is the same differential treatment that serves as the basis for his Eighth Amendment claim.

These challenges to his death sentence were not presented to the district court. Our review is therefore limited to plain error. United States v. Bourgeois, 423 F.3d 501, 506 (5th Cir. 2005). We begin our analysis by considering Ebron's Eighth Amendment argument.

The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court's early Eighth Amendment cases "examined only the 'particular methods of execution to determine whether they were too cruel to pass constitutional muster.'" McCleskey v. Kemp, 481 U.S. 279, 299 (1987) (quoting Gregg v. Georgia, 428 U.S. 153, 170 (1976)). "Subsequently, the Court recognized that the constitutional prohibition against cruel and unusual punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" Id. at 300 (quoting Weems v. United States, 217 U.S. 349, 378 (1910)). "In Weems, the Court identified a second principle inherent in the

Eighth Amendment, 'that punishment for crime should be graduated and proportioned to offense.'" Id. (quoting Weems, 217 U.S. at 367).

"The concept of proportionality is central to the Eighth Amendment." Graham v. Florida, 130 S. Ct. 2011, 2021 (2010). In Pulley v. Harris, the Supreme Court made clear that the notion of proportionality had been traditionally "used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime." 465 U.S. 37, 42-43 (1984).

The Supreme Court's cases "addressing the proportionality of sentences fall within two general classifications." Graham, 130 S. Ct. at 2021. "The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case." Id. "The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." Id. In Graham, the Supreme Court provided the following description of the latter group of cases:

> The second classification of cases has used categorical rules to define Eighth Amendment standards. The previous cases in this classification involved the death penalty. The classification in turn consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender. With respect to the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. [Kennedy v. Louisiana, 554 U.S. 407, 438 (2008)]; see also Enmund v. Florida, 458 U.S. 782 (1982); Coker v. Georgia, 433 U.S. 584 (1977). In cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of 18, Roper v. Simmons, 543 U.S. 551 (2005), or whose intellectual functioning is in a low range, Atkins v. Virginia, 536 U.S. 304 (2002). See also Thompson v. Oklahoma, 487 U.S. 815 (1988).

Id. at 2022.

In light of this precedent, we determine that the district court did not plainly err in failing to conclude that Ebron's sentence violated the Eighth Amendment. Although Ebron is correct in noting the disparity between his punishment and that faced by others involved in Barnes's murder, his proportionality argument finds no support in existing Eighth Amendment jurisprudence.[16] Accordingly, under our limited scope of review, this contention cannot be the basis for granting Ebron relief from his death sentence. In addition, we also reject Ebron's FDPA argument as it similarly lacks a legal foundation, and thus cannot be the basis for relief.

5.

In his final sentencing challenge, Ebron argues that the Sixth and Eighth Amendments were violated when the district court did not require the jury to apply the reasonable doubt standard in deciding whether the aggravating factors outweighed any mitigating factors during the selection phase. While making this contention, Ebron acknowledges that this court has already rejected this argument. See Fields, 483 F.3d at 346 ("[W]e hold that the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt."). Since this argument is foreclosed by circuit precedent, any further discussion of it is academic. Based on existing circuit precedent, we reject Ebron's attempt to undermine his sentence on this ground.

E.

After Ebron was sentenced to death, Bacote contacted Ebron's appellate attorney and indicated that he wanted to provide a statement exculpating

---

[16] In his brief, Ebron argues that the Supreme Court's decision in Enmund "requires proportionality comparison with others participating in the same crime." Enmund requires no such thing. Rather, Enmund reaffirmed the importance of a defendant's individual culpability for purposes of deciding whether a death sentence is appropriate. See 458 U.S. at 797-98.

Ebron. Bacote subsequently produced a signed affidavit in which he "correct[ed]" previous statements he had made implicating Ebron in Barnes's murder. Partially based on this affidavit, Ebron filed a motion for a new trial in October 2009. In his motion, Ebron argued, among other things, that Bacote's affidavit was "newly discovered" evidence containing information that was relevant and material to the central issues at trial and that would likely produce an acquittal on retrial. As such, he contended that a new trial was required based on Bacote's affidavit.

In January 2010, the district court resolved Ebron's motion. In its written decision, the district court concluded that Bacote's affidavit was merely impeaching, cumulative, immaterial, and lacking in credibility. Based on these conclusions, the district court denied Ebron's request for a new trial.

In his final category of issues on appeal, Ebron argues that the district court abused its discretion in denying his motion for a new trial. Specifically, he contends that the district court's grounds for denying his motion were incorrect and that Bacote's affidavit entitles him to a new trial. "This court reviews a district court's denial of a motion for a new trial for abuse of discretion." United States v. Rivera, 295 F.3d 461, 470 (5th Cir. 2002).

Motions for a new trial "based on newly discovered evidence are 'disfavored and reviewed with great caution.'" United States v. Wall, 389 F.3d 457, 467 (5th Cir. 2004) (quoting United States v. Erwin, 277 F.3d 727, 731 (5th Cir. 2001)). To receive a new trial based on newly discovered evidence, a defendant must demonstrate the following: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal." United States v. Franklin, 561 F.3d 398, 405 (5th Cir. 2009) (quoting United States v. Bowler,

72

252 F.3d 741, 747 (5th Cir. 2001)). "If the defendant fails to demonstrate any one of these factors, the motion for new trial should be denied." *Wall*, 389 F.3d at 467 (citation omitted).

In this case, the district court did not abuse its discretion in denying the motion for a new trial. To receive a new trial based on newly discovered evidence, a defendant has to show that the evidence, if introduced at a new trial, would probably produce an acquittal. *Franklin*, 561 F.3d at 405. Here, Bacote's affidavit does not satisfy this requirement. Two reasons support this conclusion.

First, the affidavit merely communicates what Bacote did not hear, see, or say. It says virtually nothing about whether Ebron committed the crime he was convicted of. Although if presented at trial the information in the affidavit could conflict with Bazile's testimony, we are unconvinced that an acquittal is the probable product of such a conflict.

Second, to the extent it says anything substantive, we conclude that it is highly unlikely that a reasonable jury would place any weight on this affidavit. As part of his guilty plea, Bacote signed a factual basis regarding his involvement in Barnes's murder. In this document, Bacote admitted that he "intentionally and deliberately assisted and aided and abetted Marwin Mosley and Joseph Ebron in the murder of Keith Barnes." He also stated that he "knew previously that the purpose of Marwin Mosley and Joseph Ebron's entry into Barnes' cell was to murder Barnes." Less than three months later, Bacote signed his affidavit in which he stated that he "never told prosecutors Ebron killed anyone." In this affidavit, he also swore that he had "never hear[d] Marwin Mosley or Joseph Ebron say they were going to kill anyone." Given these clear and temporally proximate inconsistencies, no reasonable jury would place any weight on Bacote's affidavit. If introduced at a new trial, it is extremely unlikely that the content of Bacote's affidavit would have produced an

acquittal. Accordingly, the district court did not abuse its discretion in denying Ebron's motion for a new trial.

III.

For these reasons, we AFFIRM Ebron's convictions and death sentence. We also AFFIRM the district court's denial of his motion for a new trial.